Donna BARTLEY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000683–MR.

Supreme Court of Kentucky.

June 20, 2013.

Kathleen Kallaher Schmidt, Karen Shuff Maurer, Assistant Public Advocates, for Appellant.

Jack Conway, Attorney General of Kentucky, William Bryan Jones, Assistant Attorney General, for Appellee.

Opinion of the Court by Justice ABRAMSON.

Donna Bartley appeals as a matter of right from a Judgment of the Monroe Circuit Court convicting her of first-degree assault, in violation of Kentucky Revised Statute (KRS) 508.010, and of first-degree criminal abuse, in violation of KRS 508.100. In accord with the jury's recommendation, the trial court sentenced Bartley to consecutive terms of imprisonment of twenty and ten years, respectively. Bartley and co-defendant Rita Mitchell, Bartley's friend and roommate of many years, were jointly charged with having neglected and abused Bartley's disabled son, K.B.[1] Bartley contends that the trial court erred (1) by failing to acknowledge her right to conflict-free counsel; (2) by not dismissing the assault charge; (3) by

---

1. Mitchell was convicted of first-degree assault and second-degree criminal abuse.

inadequately instructing the jury with respect to the alleged assault; (4) by failing to instruct the jury with respect to a lesser included offense of assault; (5) by denying Bartley's pre-trial motion for a continuance; and (6) by denying her motion for a mistrial when one of the Commonwealth's medical witnesses improperly testified that K.B. may have been subjected to cigarette burns. Convinced that Bartley was lawfully charged and fairly convicted, we affirm the trial court's Judgment.

### RELEVANT FACTS

The proof at trial tended to show that for several years prior to the spring of 2010, Bartley, Mitchell, and Bartley's three children lived together in Bartley's mobile home on Mudlick Flippin Road in Tompkinsville. Mitchell, a recipient of social security disability income benefits, testified that in exchange for her food and lodging she helped care for Bartley's children and the home and allowed Bartley to take control of her social security checks. In particular, she helped care for K.B., Bartley's eldest child, who, as a result of cerebral palsy, mental retardation, and possibly autism, is severely disabled.

In the late spring or early summer of 2010, Bartley and her two younger children, teenagers at the time, moved from the Tompkinsville mobile home to a new home in Glasgow. Mitchell (who herself suffers from chronic obstructive pulmonary disease and depression) and the then twenty-four year old K.B. remained in Tompkinsville. The plan, apparently, was to have the mobile home moved to Glasgow near to where the others were living, but for whatever reason that move did not occur. Instead, Bartley increasingly disassociated herself from her son and Mitchell and from their circumstances. Although she remained in control of the purse strings, including Mitchell's and K.B.'s so-

cial security benefits, she ceased to make the mortgage payments on the mobile home; ceased to provide for trash removal; ceased to pay for water service, which in August 2010 was discontinued; and visited the mobile home only on weekends, delivering food and a few gallons of water. Bartley apparently ignored the deplorable and worsening conditions in which her son and Mitchell were living.

Matters came to a head in October 2010. By then the mortgagee bank was contemplating foreclosure on the mobile home. A bank representative sent to inspect the property found his attempts thwarted by a large number of stray dogs gathered in the yard. Concerned by the dogs, by a bad smell pervading the area (perceptible as far as 100 feet from the door), and by statements from neighbors that a boy was being kept inside the premises, the inspector reported the situation to the Monroe County Sheriff's office. Soon thereafter, a deputy sheriff, assisted by a social worker from the local Cabinet for Family and Health Services office, entered the home with Mitchell's consent. They immediately encountered an almost unbearable stench, arising, at least in part, from the numerous dogs milling about and their excrement, which had been allowed to accumulate on the floors and furniture. Mitchell told them that K.B. was in the home.

The deputy sheriff and social worker then summoned emergency medical assistance, and when the E.M.S. workers arrived, they all proceeded to a back bedroom, locked from the outside, where they found K.B. Photographs they took graphically confirmed that amid heaps of snack wrappers, food scraps, and empty soft drink cans, K.B. was lying naked on a mattress, which was covered with nothing but a sheet of plastic. Through long use, apparently, the center of the mattress had become hollowed out, and in the depres-

sion where K.B. was lying was a puddle, inches deep, of his own urine and feces. His hair was matted; his toenails and fingernails, several inches long, were caked with grime; sores and feces on his skin had attracted numerous flies; and he was too weak to move. K.B.'s language abilities are very limited, but he repeatedly asked the rescuers for "coke" and "cookie." Initially, even the E.M.S. workers were unsure how to proceed, but eventually, with additional assistance from some volunteer firefighters, K.B. was removed to the Monroe County Medical Center. Several people involved in this rescue testified at trial. They expressed shock at the deplorable conditions in which K.B. had been found, describing it as "a scene from a horror movie" and "as close to a Holocaust scene as I will ever see."

Several of the medical personnel who treated K.B. also testified, including the nurses who bathed him and fed him during his two week hospital stay[2]. The nurses described K.B. as having been covered in feces literally from head to toe. They washed it from his hair, from the length of his body, and from his feet. It was caked behind his long fingernails; and it was on his teeth. The foul odor clung to him for many days as did the stain upon his skin. It was also several days before K.B. could resume normal eating. He had arrived at the hospital very hungry, but when the nurses fed him ordinary food, he vomited. Consequently, for several days, he was given baby food while his digestive system recovered.

The physician who treated him testified that K.B.'s digestive problem, apparently the result, in part at least, of a gas blockage in the small bowel, was serious and could have been fatal, had it not been treated.[3] Likewise, K.B.'s contact with his feces, particularly the feces in his mouth, had exposed him to a very serious risk of bacterial, especially E-coli, infection and sepsis, which is potentially fatal.

In addition to having been exposed to those potentially grave conditions, K.B. had also suffered, according to the doctor, a number of lesser, but significant, injuries. His skin had developed bed sores and papules—raised red dots—that K.B. had scratched open. His skin had also sagged and wrinkled due to his extreme weight loss. More seriously, K.B.'s left clavicle had become displaced and his left shoulder had collapsed inward, a result, the doctor believed, of his having lain too long and too uninterruptedly on that side. His muscles had atrophied to the point that he had lost much of his mobility; only months later would he finally regain the ability to walk. He had become deficient in several vitamins, including the fat soluble vitamins A and D. His teeth, too, were severely decayed, and, indeed, all were removed within a year of his release from the hospital. Asked whether K.B.'s condition could have developed in the two weeks immediately prior to his rescue, the doctor explained that it could not have. The shoulder collapse, the muscle atrophy, and the vitamin A and D deficiencies all required several weeks if not months to develop. Months, too, were necessary for the growth of K.B.'s inches-long fingernails and toenails.

Mitchell, nevertheless, testified that until about two weeks prior to the rescue, conditions in the home generally and K.B.'s condition in particular had not been

---

**2.** The hospital stay was followed by a nine-month stay in a nursing home before K.B., who is now in the state's custody, was transferred to an adult care home.

**3.** It took more than seven days for his intestinal tract to resume working. Untreated, the condition could have destroyed K.B.'s bowel and killed him, according to the physician.

so bad. That happened to be, according to Mitchell, about the time of Bartley's last visit. Mitchell claimed that Bartley regularly brought groceries, water, and clean sheets for K.B., and spent time visiting with him. During those last two weeks, however, Mitchell testified that Bartley had not been by, and Mitchell's depression had become so severe that it rendered her incapable of caring for K.B. or of tending to the home. It was only during those last two weeks, Mitchell said, that K.B.'s plight had become the dire one the rescuers discovered.

During cross-examination by the Commonwealth, Mitchell admitted that she felt intimidated by Bartley, who, during the long course of their relationship, had always been the one in charge, and who had even struck her and knocked her down on one occasion. She explained that she had not sought help for K.B. because she feared that he would be removed from their custody and that Bartley "would be mad." Mitchell acknowledged that K.B. had not left the bedroom in which he was found for several months preceding his rescue. Mitchell's closing argument stressed her own limitations, the overwhelming situation in which she found herself when Bartley left the care of K.B. to her, and Bartley's failure to render even such minimal assistance as having the water service restored.[4]

Bartley opted not to testify, but she argued during closing that "it was Rita's [Mitchell's] fault." According to Bartley, the evidence showed only that she had entrusted K.B.'s care and custody to Mitchell, that she had found K.B. well the many times she had checked on him, and that it was only toward the end that she had relied—unwisely perhaps but not

criminally—on Mitchell's assurances that K.B. was well. As noted, Bartley was convicted of first-degree assault, a Class B felony, and first-degree criminal abuse, a Class C felony. Bartley now contends that during trial she was denied, in a number of ways, a fair opportunity to develop and present her defense. Our analysis begins, however, with her claim that her defense was undermined from the outset when she was assigned counsel who, because he worked in the same public defender's office as Mitchell's counsel, labored under a conflict of interest.

### ANALYSIS

**I. Counsel's Representation of Bartley Was Not Adversely Affected By a Conflict of Interest.**

██ Bartley asserts, and the Commonwealth does not dispute, that although she and Mitchell were represented by different attorneys, both attorneys worked for the same office, the Glasgow trial office of the Kentucky Department of Public Advocacy. Mitchell was represented by one of the office's staff attorneys while Bartley was represented by the office's director. At no time prior to or during trial did either defendant, either attorney, or the trial court object to or question the propriety of that arrangement. Bartley now contends, however, that the joint representation by the public defender's office created a conflict of interest and that the conflict is so likely to have had an adverse affect on her attorney's performance as to entitle her to a new trial. Because Bartley has failed to identify any such adverse affect on her attorney's performance, we reject her first allegation of error.

---

**4.** The water bills which Bartley failed to pay were minimal: $16.93 for July 2010 and $14.85 for August. Bartley received $674 monthly in benefits for K.B. and another $948 monthly for herself and her daughter. She also received Mitchell's monthly check.

As Bartley correctly notes, her right under the Sixth Amendment to the Constitution of the United States to the effective assistance of counsel includes the right to counsel whose loyalty to her is not divided by a conflicting interest. *Holloway v. Arkansas,* 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978). To help protect that right, Kentucky Rule of Criminal Procedure (RCr) 8.30 provides in part that in criminal matters where confinement or a substantial fine is at stake, "no attorney shall be permitted at any stage of the proceedings to act as counsel for the defendant while at the same time engaged as counsel for another person or persons accused of the same offense or of offenses arising out of the same incident or series of related incidents" unless, among other conditions, the trial court explains the attorney's possible conflict of interest to the defendant, and the defendant waives in writing any objection thereto. *See* RCr 8.30(1).

In *Kirkland v. Commonwealth,* 53 S.W.3d 71 (Ky.2001), we assumed without discussion that representation of co-defendants by two attorneys from the same public defender's office implicates this rule.[5] We held, however, that where neither the defendant nor his counsel objected to the representation, the trial court's failure to give the warning required by the rule and to obtain the defendant's waiver did not entitle the defendant to a new trial, unless the defendant showed that his attorney's potential conflict of interest had materialized and had adversely affected his performance. This is the same "actual conflict" standard the United States Supreme Court has applied to unpreserved claims of multiple-representation-based violations of the Sixth Amendment. *See Mickens v. Taylor,* 535 U.S. 162, 168–69, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (discussing *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)).

Relief was not warranted in *Kirkland,* we explained, because whatever may have been the potential for conflict, no actual conflict ever materialized: the codefendants' defenses were not antagonistic and neither codefendant had made any statements contradictory of the other's. Here, of course, the codefendants' defenses were antagonistic, but even assuming the existence of a conflict, to be entitled to relief, Bartley must show that the conflict adversely affected her counsel's performance. She must show, that is, "some specific defect in [her] counsel's strategy, tactics, or decision making attributable to [the] conflict.... Speculative allegations and conclusory statements are not sufficient...." *People v. Morales,* 209 Ill.2d 340, 283 Ill.Dec. 544, 808 N.E.2d 510, 515 (2004) (citations and internal quotation marks omitted). This Bartley has failed to do.

Aside from a great deal of speculation about how her counsel's decisionmaking might have been affected by litigating against another, subordinate attorney from his office, the only specific defect in counsel's performance Bartley can point to is an alleged failure to cross-examine Mitch-

---

**5.** Whether and to what extent public defender organizations are to be deemed "firms" under the rule imputing one attorney's conflicts to other attorneys in his or her firm, Supreme Court Rule (SCR) 3.130(1.10), are questions many courts have wrestled with over the years. *See e.g., State v. St. Dennis,* 358 Mont. 88, 244 P.3d 292 (2010); *Duvall v. State,* 399 Md. 210, 923 A.2d 81 (2007); *Asch v. State,* 62 P.3d 945 (Wyo.2003); *People v. Christian,* 41 Cal.App.4th 986, 48 Cal.Rptr.2d 867 (1996); *People v. Robinson,* 79 Ill.2d 147, 37 Ill.Dec. 267, 402 N.E.2d 157 (1979). We need not delve into those questions here—questions which have not been briefed—because, as discussed below, even assuming, as we did in *Kirkland,* that RCr 8.30 applies, the purported conflict does not provide grounds for reversal.

ell vigorously enough. Bartley complains that counsel questioned Mitchell for only about six minutes, and she contends that rather than trying to capitalize on important admissions Mitchell made near the end of the Commonwealth's cross-examination of her, counsel instead "put his foot on the brake" at a time when Mitchell was providing testimony favorable to Bartley. This is not an accurate characterization of counsel's performance.

Rita Mitchell, both in the statements she made to investigators prior to trial and in her testimony during trial, was anything but a clear, coherent, and consistent witness. At various points during her testimony, Mitchell said that Bartley was aware of the conditions inside the mobile home and then that Bartley was not aware of them; she said that Bartley had seen the feces smeared on K.B.'s body and that Bartley had not seen his condition; she said that Bartley had brought clean sheets to the mobile home as recently as the Friday before the Wednesday when K.B. was rescued and then that Bartley had not visited the mobile home for two weeks prior to the rescue.

Toward the end of her cross-examination by the Commonwealth, Mitchell became increasingly adamant that Bartley had not been to the mobile home during the two weeks immediately prior to K.B.'s rescue and that it was only during those two weeks that K.B.'s condition had become so egregious. She reiterated that testimony even in the face of the prosecutor's reminders that the rescuers had described and taken pictures of deplorable conditions that could not possibly have developed in so short a period.

Bartley's counsel then, as Bartley notes, had his turn at cross-examining Mitchell. Counsel's dilemma, plainly, was somehow to distance Bartley from the appalling conditions in which K.B. had been found without at the same time making it seem that

she had abandoned her son altogether. Mitchell's assertion that Bartley had visited the mobile home regularly until the last two weeks, and only then had conditions there become unspeakably awful, answered Bartley's dilemma about as well as could be hoped. Counsel thus had Mitchell repeat what she had just said: that Bartley had been actively concerned, but that she had not been aware of how bad things had become in the final two-week period. Counsel did not, it is true, press Mitchell for additional details, but that decision was clearly prompted, not by any sense of obligation to Mitchell or to Mitchell's counsel, but by a very justifiable fear that if pressed Mitchell would contradict herself yet again and say something damaging to Bartley's case. This impression is confirmed by Bartley's counsel's closing argument, an argument largely devoted to lambasting Mitchell and one providing no suggestion whatsoever that counsel felt obliged to "spare" her.

We are thus convinced that, even if counsel's representation of Bartley could be deemed conflicted, the conflict of interest was not objected to and has not been shown to have adversely affected counsel's performance in any perceptible way; it does not, therefore, entitle Bartley to relief. That said, we remind trial judges and counsel, both for the defense and the Commonwealth, that the orderly administration of justice is best-achieved when a potential conflict of interest is addressed at the outset pursuant to RCr 8.30. Counsel and the trial court should be attuned to the potential for a conflict of interest in any case involving multiple defendants and, where appropriate, take the necessary steps to address it.

## II. Bartley Was Lawfully Charged With and Fairly Convicted of First–Degree Assault.

█ Bartley next challenges her conviction for assault. She contends, first, that

the assault conviction was "simply nonsensical" in that KRS 508.010, the first-degree assault statute, was not intended to apply to cases of neglect. In her view, the application of it here effectively creates a new crime not authorized by the Penal Code. She also contends that if there is such a crime as "assault by neglect," the jury instruction pertaining to it omitted the essential element of "duty" and in that way undermined the fairness of her trial. Finally, she contends that the trial court erred by failing to instruct the jury on the lesser included offense of neglect of an adult, as defined by KRS 209.020 and outlawed by KRS 209.990. We begin with Bartley's contention that the assault statutes do not apply to failures to act, but outlaw only "overt acts."

## A. Under the Penal Code a Person Can Commit Assault By Failing To Perform a Legal Duty.

KRS 508.010 provides in pertinent part that

> A person is guilty of assault in the first degree when,

(a) He intentionally causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument; or

(b) Under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a grave risk of death to another and thereby causes serious physical injury to another person.

As Bartley notes, an "assault" is popularly understood as an attack, an application of force by one person against another.[6] Because an attack connotes some overt and affirmative act, Bartley maintains that KRS 508.010 and the other statutes outlawing assault must be understood as applying only to such affirmative acts and not to the sort of failure to act alleged here. Given the language employed by our General Assembly, we disagree.

KRS 508.010(1)(b), the subsection of the statute Bartley was found to have violated, outlaws not a particular sort of overt act, but rather the infliction of a serious physical injury.[7] The injury must have been

---

**6.** Popular understanding of the word "assault" is actually of little use because the law has never tracked common usage of the word:

> Ordinary usage creates a certain difficulty in pinning down the meaning of 'assault.' Etymologically, the word is compounded of the Latin *ad* + *saltare*, to jump at. In popular language, it has always connoted a physical attack. When we say that D assaults V, we have a mental picture of D attacking V, by striking or pushing or stabbing him. In the middle ages, however, the terms 'assault' and 'battery' were given technical meanings which they have retained ever since. It became settled that though an assault could be committed by physical contact, it did not require this, since a show of force raising an apprehension in the mind of the victim was sufficient. Also, a 'battery' did not require an actual beating; the use of any degree of force against the body would suffice. The acts of spitting on a person and kissing without consent are both batteries.

BLACK'S LAW DICTIONARY, p. 130 (9th ed.2009). (*citing* Glanville Williams, *Textbook of Criminal Law* 135–36 (1978)).

**7.** Causing serious physical injury can be an element of first-degree criminal abuse, of which Bartley was also convicted, but that was not the basis for her abuse conviction. The pertinent jury instruction provided:

> You will find the Defendant guilty of Criminal Abuse in the First Degree if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
> **A.** That in this county on or about the 20th day of October, 2010 and before the finding of the Indictment herein, she had actual custody of [K.B.] and intentionally permitted him to be abused by Rita Mitchell.
> AND
> **B.** That such abuse:
> (1) Caused serious physical injury to [K.B.];
> OR

the result of the defendant's "conduct," and that conduct must have been wanton;[8] it must have been engaged in under circumstances manifesting extreme indifference to the value of human life; and it must have created a grave risk of death to another. Notably KRS 501.030(1) provides that "engag[ing] in conduct," for the purposes of Penal Code liability, "includes a voluntary act *or the omission to perform a duty which the law imposes upon [a person]* and which he is physically capable of performing" (emphasis supplied). On its face, therefore, KRS 508.010(1)(b) would seem to include the idea of assault by "omission to perform a duty" as alleged here, provided that the neglect of duty caused a serious physical injury and satisfied the elements of wantonness, extreme indifference, and grave risk of death. The Commentaries to our Penal Code and to the Model Penal Code confirm this impression.

As discussed in the Commentary to our Penal Code,[9] the Code's assault provisions were meant to incorporate and to modify

> **(2)** Caused [K.B.]to be placed in a situation which might have caused him serious physical injury;
> OR
> **(3)** Caused [K.B.]to be subjected to torture, cruel confinement or cruel punishment.
> AND
> **D.** That [K.B.] was at that time physically helpless or mentally helpless.
> If you find the Defendant guilty under this Instruction, you will state in your Verdict that you find her guilty under Instruction No. 5 and you will further state whether guilt is found under subsection B(1), B(2) or B(3).
> "Abuse" was correctly defined as "the infliction of physical pain, injury or mental injury, or the deprivation of services by a person which are necessary to maintain the health and welfare of a person."
> The jury found Bartley guilty under (B)(3), pertaining to torture, cruel confinement or cruel punishment. Bartley has not challenged her criminal abuse conviction.

significantly the then existing crimes of assault and battery. Under both the common law and the statutes then in effect, "assault [was] defined as an attempt to commit a battery, which in turn [was] defined as the unlawful application of force to the person of another." *Kentucky Penal Code, Final Draft* p. 103 (November 1971) (citation and internal quotation marks omitted). The new provisions departed from this common law focus on an "offensive touching," (the popular notion of assault upon which Bartley relies), and focused instead on the outlawed result. As the Commentary to the Model Penal Code puts it, "[t]he principal thrust of Section 211.1 [Assault] is to reach the infliction of physical injury." *Model Penal Code and Commentaries,* Part II, § 211.1 p. 187 (1980).

This new focus on physical injury as an unlawful result both narrowed and broadened the scope of the prior assault/battery offenses. The scope was narrowed by the removal of non-physically injurious touch-

8. KRS 501.020(3) provides:

> "Wantonly"—A person acts wantonly with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.

The trial court's instructions to the jury included this definition.

9. KRS 500.100 provides that the Commentary "may be used as an aid" in construing the Penal Code's provisions.

ings, which, though still potentially criminal, would no longer be treated as assaults. *See e.g.*, KRS Chapter 510 defining and outlawing various instances of "sexual contact." The scope of "assault" was also broadened, however, because " 'bodily injury' includes more than the consequences of direct attack. It also covers, pain, illness, or physical impairment caused indirectly, as, for example, by exposing another to inclement weather or by non-therapeutic administration of a drug or narcotic." *Model Penal Code*, § 211.1 at p. 187.[10]

The Commentary to our Penal Code makes a similar reference to this expanded notion of assault as encompassing the indirect infliction of physical injury. Discussing the provision outlawing "abandonment of a minor," the Commentary notes that

> [t]he purpose of Section 3325 is to prohibit an act of abandonment which would constitute a serious threat to the minor's welfare. The statute is designed to protect a minor who is too young to seek assistance or is otherwise incapacitated or is left in an isolated place. Section 3325 is intended to cover those situations where the abandonment is quickly discovered and the minor suffers no physical harm. If the minor dies, *suffers physical injury*, or is placed in a situation which creates a substantial risk of serious physical injury, then the perpetrator commits a more serious crime such as murder, manslaughter, *assault* or endangerment.

*Kentucky Penal Code, Final Draft* pp. 330–31 (November 1971) (emphasis added). Both the statutory terms and the Commentary indicate, therefore, that far from "nonsensical," the idea that "assault" can include physical injury indirectly inflicted by neglect is one fully embraced by the

Kentucky Penal Code and the Model Code from which it derived.

"Assault" in this sense appears not to have figured in any Kentucky published appellate decision, but the parallel idea of homicide by neglect—death in that instance being the outlawed result—has been recognized both before and after the adoption of the Penal Code. In *Gibson v. Commonwealth*, 106 Ky. 360, 50 S.W. 532 (1899), the court upheld the manslaughter conviction of a woman who, in the middle of November, left her two-month old child on a stranger's porch, resulting in the child's death from exposure. "The law," the Court stated,

> imposed upon defendant the duty of protecting and caring for her offspring to the best of her ability; and when she willfully abandoned it on a cold, raw night, and left it to die from exposure, she was guilty of a felony.... If a person do or omit to do an act towards another, who is helpless and dependant, which act or omission, in usual natural sequence leads to death [the person commits a homicide, either manslaughter or murder depending on the circumstances.]

50 S.W. at 532–33 (citation and internal quotation marks omitted). Similarly, in *Westrup v. Commonwealth*, 123 Ky. 95, 93 S.W. 646 (1906), the Court observed that

> [a]ny person neglecting to discharge a duty required of him, either by law or contract, thereby causing the death of another, is guilty of involuntary manslaughter. Thus, if a parent ... neglects to supply food and clothing or medical attendance to a child ... whom he is under a legal obligation to maintain, and the child ... dies of the ne-

---

**10.** KRS 500.080(13) defines "physical injury" as "substantial physical pain or any impair-

ment of physical condition."

glect, he is guilty of involuntary manslaughter.

93 S.W. at 646 (citation and internal quotation marks omitted). *Cf. People v. Burden,* 72 Cal.App.3d 603, 140 Cal.Rptr. 282, 289 (1977) (upholding homicide-by-neglect conviction and collecting cases to the effect that "[t]he omission of a duty is in law the equivalent of an act and when death results, the standard for determination of the degree of homicide is identical.").

More recently, our Court of Appeals upheld, under the current Penal Code, the reckless homicide convictions of a man and his wife who were found guilty of having breached a duty to care for the man's disabled sister, who died as a result of the neglect. The Court of Appeals explained that

> [t]he law recognizes that under some circumstances the omission of a duty owed by one individual to another, where such omission results in the death of the one to whom the duty is owing, will make the other chargeable with [homicide]. This rule of law is always based upon the proposition that the duty neglected must be a legal duty, and not a mere moral obligation. It must be a duty imposed by law or contract, and the omission to perform the duty must be the immediate and direct cause of death.

*West v. Commonwealth,* 935 S.W.2d 315, 317 (Ky.App.1996) (citation and internal quotation marks omitted).

Inasmuch as under KRS 501.030(1) one can engage in criminal conduct by failing to perform a legal duty, and inasmuch as under KRS Chapter 508 assault has been redefined as a "result" crime analogous in most respects to the other principal result crime—homicide—we agree with the Commonwealth and with the trial court that assault, like homicide, can, under our law, be committed by neglect. Where the ne-

glect in such cases results not in death, but in physical injury or serious physical injury, the offense committed is punishable as an assault provided all of the other statutory elements are met.

Bartley resists this conclusion by referring us to ostensibly contrary cases from our sister states. The cases she cites are inapposite, however, since all of them, with one arguable exception, involve "assault" in the common-law sense that our Penal Code superseded. The one somewhat pertinent case, *State v. Miranda,* 274 Conn. 727, 878 A.2d 1118 (2005), is not really to the contrary. In that case, a defendant was convicted of assault by inaction for having failed to protect his girlfriend's child from the girlfriend's physical abuse. The Supreme Court of Connecticut reversed, but the Court divided on the grounds for reversal. Three justices concluded that, even if assault could be committed by inaction, the defendant should not have been so charged because his relationship to the child did not give rise to a legal duty to protect her. Three other justices rejected the very idea of assault by inaction, the position Bartley advocates. They did so because, unlike our Penal Code, which expressly includes "omission to perform a [legal] duty" as potentially criminal conduct, Connecticut's Penal Code makes no such provision. The three justices viewed this departure from the Model Penal Code's approach as evidence that their legislature intended to preserve the common-law idea of assault as a physical attack. Since, as discussed below, Bartley had a legal duty to care and provide for her son, and since the Kentucky Penal Code both recognizes breach of duty as a potential *actus reas* and deliberately shifts the focus of assault from an act to a resulting physical injury, *State v. Miranda* is not at odds with our decision and could even be thought to support it.

Bartley also argues that if our General Assembly had intended "assault" to apply to cases of neglect, such as this one, it "would have had no occasion" to enact KRS Chapter 209, "Protection of Adults" which, among things, outlaws the abuse, neglect, or exploitation of disabled adults. KRS Chapter 209, however, is meant to protect disabled adults from far more than physical injury, *see* KRS 209.020 defining "abuse," "neglect," and "exploitation," and so is hardly made redundant by the criminal assault statutes. The overlap in the conduct prohibited by the two chapters, KRS Chapter 209 and KRS Chapter 508, is neither surprising nor, absent contrary guidance by the General Assembly, a reason to construe either of them more narrowly than their plain terms suggest. In *Lane v. Commonwealth,* 956 S.W.2d 874 (Ky.1997), a similar argument was raised regarding the overlap between assault and the child abuse statutes in KRS Chapter 620. This Court stated that, "[t]he statutes of Kentucky define many criminal offenses. A single criminal act may violate more than one statute. Under such circumstances, it is within the proper discretion of the prosecutor to decide which crime the defendant should be charged with." 956 S.W.2d at 876. *See also, Flynt v. Commonwealth,* 105 S.W.3d 415 (Ky. 2003) (discussing prosecutorial discretion generally). Moreover, unlike the assault statutes, the abuse offenses defined in KRS Chapter 209 make no distinction between physical injury and serious physical injury, nor do they address specifically those injuries inflicted under circumstances manifesting extreme indifference to human life. Where these aggravating factors are present, prosecution for the more serious assault charge is well within what the General Assembly intended. In sum, the trial court did not err by denying Bartley's motion for a directed verdict on the assault charge due to the absence of an overt act.[11]

## B. Bartley Was Not Entitled To A Jury Instruction Asking The Jury To Decide If She Owed Her Son A Duty Of Care.

■ Bartley next contends that even if "assault by neglect" is a crime with which she could lawfully be charged, the pertinent jury instruction omitted one of the crime's essential elements and thus deprived her of a fair trial. With respect to first-degree assault, the trial court followed the model instruction for the wanton version of that offense. The model instruction provides as follows:

> You will find the Defendant guilty of First–Degree Assault under this instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about _____ [date] and before the finding of the Indictment herein, he caused a serious physical injury to _____ [victim] by _____ [method]; and
>
> B. That in so doing, the Defendant was wantonly engaging in conduct which created a grave risk of death to another and thereby injured _____ [victim] under circumstances manifesting extreme indifference to the value of human life.

Cooper and Cetrulo, *Kentucky Instructions to Juries, Criminal* § 3.34 (2012). For "date," in the model instruction, the trial court substituted "October 20, 2010,"

11. Bartley also invokes the rule of lenity, according to which otherwise irresoluble ambiguities in penal statutes are to be decided in favor of the defendant. *White v. Commonwealth,* 178 S.W.3d 470 (Ky.2005). Since the first-degree assault statute is not ambiguous, but by its terms includes the "assault by neglect" offense of which Bartley was found guilty, the rule of lenity does not apply.

for "victim," "[K.B.]," and for "method," "by severely neglecting to meet his needs." Bartley reiterates her contention that "neglecting to meet another's needs" is not a method by which one can commit assault, but even if it is, she insists the instruction is deficient because it omits the requirement that the jury also believe that she "had a legal duty to provide for his [K.B.'s] needs."

As noted above, in providing for criminal liability on the basis of an "omission," or a failure to act, KRS 501.030(1) requires that the "omission" amount to the breach of a "duty which the law imposes upon [the defendant] and which he is physically capable of performing." Bartley maintains that the existence of a duty is thus an element of "assault by neglect" which the Commonwealth must prove, and which the jury must find beyond a reasonable doubt. She refers us to *West v. Commonwealth,* a case like this one in which it was alleged that the defendants failed to provide adequate care to a disabled adult. In that case, the Court of Appeals construed KRS 501.030's duty requirement, as does Bartley, as "a critical element of the crime charged," 935 S.W.2d at 317, and opined that it was for the jury to decide whether or not the defendant "was under a duty to provide . . . appropriate care." *Id.*

The obvious problem with that view, however, is that whether a legal duty exists is purely a question of law, and in our system questions of law are generally resolved by the court, not the jury. RCr 9.54 ("It shall be the duty of the court to instruct the jury in writing on the law of the case."); *Stinnett v. Commonwealth,* 364 S.W.3d 70, 77 (Ky.2011) (explaining that in a kidnapping case, "[t]he trial court, rather than the jury, determines whether the exemption [statute, KRS 509.050] applies"); *Holbrooks v. Commonwealth,* 85 S.W.3d 563, 570 (Ky.2002) (ex-

plaining that in a perjury case, "[w]hether a false statement is 'material' . . . is a question of law to be resolved by . . . [the] *trial court judge* [ ]") (citation and internal quotation marks omitted); *Allen v. Commonwealth,* 997 S.W.2d 483, 485 (Ky.App. 1998) (holding that "the question of corroboration in a promoting prostitution case is one of law for the trial court to determine"); *Johnson v. Commonwealth,* 875 S.W.2d 105, 107 (Ky.App.1994) (holding, in a burglary case, that "[t]he question of whether the porch constituted part of the 'dwelling' for purposes of KRS 511.030 was a question of law for the trial judge"); *and see Medley v. Commonwealth,* 704 S.W.2d 190, 191 (Ky.1985) (explaining the fundamental principle that in criminal cases a jury has "the right to disbelieve the evidence, [but] not to disregard the law").

■ In negligence cases, which also involve allegations that the defendant has inflicted an injury by violating a duty, the existence of the duty is a question of law for the court, while questions regarding breach, injury, and causation are, generally, for the jury. *Grand Aerie Fraternal Order of Eagles v. Carneyhan,* 169 S.W.3d 840 (Ky.2005); *Pathways, Inc. v. Hammons,* 113 S.W.3d 85 (Ky.2003); *Mullins v. Commonwealth Life Ins. Co.,* 839 S.W.2d 245 (Ky.1992). At least one court has applied a like formula to criminal cases where the gravamen of the offense is an alleged omission, or failure to perform a duty. In *State v. Hocter,* 362 Mont. 215, 262 P.3d 1089 (2011), the Supreme Court of Montana upheld the criminal endangerment conviction of a woman accused of having failed to seek medical attention for an injured child. Applying *actus reas* provisions very much like our KRS 501.030, the Court stated that criminal liability will not attach to a failure to act, "[i]n the absence of 'a duty that the law imposes.' " 262 P.3d at 1095. The Court then noted

that "[w]hether a legal duty to act exists is a question of law for the court. . . . Whether a defendant failed to act pursuant to that duty is a question for the finder of fact." *Id.* (citations omitted). Accordingly, the Court held, since "questions of law are not properly considered by the trier of fact," 262 P.3d at 1096, the trial court correctly itself determined as a matter of law whether the defendant owed the victim "a duty to summon medical aid," *id.,* and only then "properly required the jury to determine whether [the defendant] breached that duty." *Id.*

With one caveat, we conclude this is the correct approach. When the Commonwealth accuses a defendant of a criminal omission, it must satisfy the trial court that, as a matter of law, a legal duty required the defendant to act, or at least that a legal duty required a person encountering the circumstances the Commonwealth alleges existed to act. Of course, and this is our caveat, the defendant may deny the duty-creating circumstances, and in that case the jury, in addition to breach, injury, and causation, should be asked to pass on the disputed factual circumstances as well. *See, e.g., Jones v. United States,* 308 F.2d 307, 310 (D.C.Cir.1962) (noting, in a case of alleged criminal neglect of a child, that "whether [the defendant] assumed the care of the child and secluded him from the care of his mother [thus giving rise to a duty to care for the child]," were questions of fact for the jury).

This was the point of one of our observations about the jury instructions in *Tharp v. Commonwealth,* 40 S.W.3d 356 (Ky. 2000). In that case we upheld the wanton-murder-by-complicity conviction of a woman accused of having breached her legal duty to protect her child from violent assault by her husband. We rejected the woman's contention that the jury instruc-

tions should have, pursuant to KRS 501.030(1), required "a finding that [she] was 'physically capable of performing' her duty to prevent the conduct causing her child's death." 40 S.W.3d at 366. We noted that the jury's determination of whether the mother breached her duty would have included its consideration of her physical infirmities, and otherwise we dismissed her claim that KRS 501.030(1) had any direct bearing on the jury instructions. 40 S.W.3d at 366–67. However, we noted that the instructions could have, and perhaps should have, included as an element the facts giving rise to the legal duty the woman allegedly breached—in that case the facts that the woman was the mother and custodian of the child victim. Those facts not being in dispute, however, their omission from the instructions did not amount to a palpable error. 40 S.W.3d at 367.

Here, Bartley contends that the instructions should have required the jury to find that she, the defendant, "had a legal duty to provide for his [K.B.'s] needs." Because the existence of such a duty is a question of law for the court and not one of fact for the jury, the trial court correctly ruled that the defendants' proposed "duty" instruction was improper.

That is not to say, however, that Bartley was not entitled to know the source of the duty she had allegedly breached, or that she was not entitled to have the instructions reflect any factual dispute about the applicability of the alleged duty in the circumstances of this case. As discussed above, to proceed with a prosecution alleging a criminal omission, the Commonwealth must, under KRS 501.030(1), identify a specific "legal duty," the breach of which would subject the defendant to criminal sanction. Any dispute about the existence of the alleged duty should be resolved by the trial court, and disputes

about the facts giving rise to that duty in the particular case should be incorporated in the instructions for jury resolution. Here, it does not appear that trial counsel for the Commonwealth ever identified the source or nature of the duty Bartley allegedly owed to K.B. He should have done so, inasmuch as KRS 501.030(1) has a clear "legal duty" requirement.

■ Although it was error for the Commonwealth not to specify the source and nature of the duty Bartley allegedly violated, Bartley has not referred us to any place in the record where that error was preserved. Her directed verdict motion, although it touched on the "duty" question, did not elicit a ruling on that issue from the court,[12] and, as noted, her request for a "duty" jury instruction went no further than an improper request that the jury be asked to decide a question of law. It was, of course, Bartley's obligation to obtain pertinent rulings from the trial court. *Hannah v. Commonwealth,* 306 S.W.3d 509, 516–17 (Ky.2010) (noting that it is "the duty of one who moves the trial court for relief to insist upon a ruling").

Since the error was not preserved; Bartley is entitled to relief only if it was palpable. To be palpable it must have been apparent to the parties and the court, and must have resulted in "manifest injustice," *i.e.,* it probably, not just possibly, affected the outcome of the proceeding, or so fundamentally tainted the proceeding as to "threaten [the] defendant's entitlement to due process of law." *Martin v. Commonwealth,* 207 S.W.3d 1, 3 (Ky.2006) (discussing RCr 10.26). Because the error did not render Bartley's trial or conviction manifestly unjust, it does not call for relief.

There is no dispute, as the Commonwealth notes, that Bartley is K.B.'s mother. Nor is there any dispute that K.B. is dependent as a result of serious physical and mental disabilities. At common law, as noted above, parents, concomitant with their fundamental right to raise their children and to have the benefit of the children's services, had a duty to protect, maintain, and educate them. *Cashen v. Riney,* 239 Ky. 779, 40 S.W.2d 339 (1931). Although the parent's duty to support his or her disabled adult child was not as clear, *see* M.C. Dransfield, *Parent's Obli-*

12. Contrary to Bartley's contention, her directed verdict motion did not preserve the instruction issue she has raised on appeal. Although her motion for a directed verdict included a brief assertion that the Commonwealth's proof included "no evidence of a duty," her motion focused on her contention that assault required an overt act and cannot be committed by neglect. It was this latter contention that the Commonwealth addressed in its response to the motion and that the trial court addressed in denying a directed verdict. Bartley did not then reassert her motion on the ground that evidence of a duty was lacking, and thus neither the Commonwealth nor the court responded to that claim. Even had Bartley adequately broached the duty question, moreover, her directed verdict motion would not have preserved the instructional issue because a directed verdict motion (more properly in this case a motion to dismiss the first-degree assault charge) seeks to avoid the giving of an instruction. It does not address what, if it is given, the instruction should say. An opportunity to address that latter question comes, of course, at the instruction conference. At the conference in this case, consideration of the "duty" question was limited to Bartley's joining in Mitchell's tender of the instruction noted in the text (requiring a jury finding that she "had a legal duty to provide for K.B.'s needs") and the trial court's brief observation that in its view that instruction was "improper." We agree with that assessment, as far as it goes, and otherwise the issue was not preserved. The mere tendering of an erroneous instruction does not preserve a *post hoc* claim that a different instruction might have been warranted. *Long v. Commonwealth,* 559 S.W.2d 482 (Ky.1977) (*citing* RCr 9.54 and noting that the tender of an erroneous instruction does not, as the rule requires, "fairly and adequately" present a party's position to the court).

*gation to Support Adult Child,* 1 A.L.R.2d 910 (1948, updated weekly), by early in the twentieth century, at least, our courts had recognized such a duty in some circumstances. *Breuer v. Dowden,* 207 Ky. 12, 268 S.W. 541 (1925) (citing *Crain v. Mallone,* 130 Ky. 125, 113 S.W. 67 (1908)). Breaches of a parent's duty resulting in a child's death could subject the parent to felony sanctions. *Gibson v. Commonwealth,* 50 S.W. at 532.

■ A parent's common law rights and duties have now been codified in a number of statutes, including KRS 405.020, the so-called nurturing statute. In addition to providing that "[t]he father and mother shall have the joint custody, nurture, and education of their children who are under the age of eighteen (18)," KRS 405.020(1), it also provides that "[t]he father and mother shall have the joint custody, care, and support of their children who have reached the age of eighteen (18) and who are wholly dependent because of permanent physical or mental disability." KRS 405.020(2). A parent's duty to provide care and support for a permanently disabled and dependent child does not cease when the child turns eighteen, but remains ongoing. *Williams v. West,* 258 S.W.2d 468 (Ky.1953); *Nelson v. Nelson,* 287 S.W.3d 667 (Ky.App.2009) (citing *Abbott v. Abbott,* 673 S.W.2d 723 (Ky.App.1983)).

The duty imposed by the nurturing statute was considered in *Lane v. Commonwealth,* 956 S.W.2d at 874. In that case, a divided court reinstated the assault-by-complicity conviction of a woman whose boyfriend physically abused and seriously injured the woman's child. The mother was accused of having breached her legal duty to make a reasonable attempt to prevent the abuse. Five members of the Court agreed that the woman was under such a duty and could be criminally prosecuted for having violated it, but a majority

of the Court could not agree on the precise source of that duty. The plurality opinion (three justices) declined to say that KRS 405.020 by itself extended criminal liability to a parent's failure to protect his or her child from abuse perpetrated by a third person. In conjunction with other statutes, however—the statute mandating that child abuse be reported, KRS 620.010, and the criminal abuse statutes, KRS 508.100, *et seq.,* which, among other things, outlaw the permitting of abuse—KRS 405.020 did, the plurality believed, impose on parents a criminally sanctionable duty to prevent a third person's abuse of their children.

Two concurring justices in *Lane* understood the parent's duty to prevent harm to his or her child, including harm perpetrated by a third person, as arising rather from the "special relationship" that exists between parent and child, the relationship recognized at common law and now embodied in KRS 405.020. Statutes such as KRS 530.040, "Abandonment of a Minor"; KRS 530.060, "Endangering the Welfare of a Minor"; and KRS 508.100, "Criminal Abuse" made clear, in the view of the concurrence, that breaches of the parent's duty could give rise to criminal sanctions. 956 S.W.2d at 876 (concurring opinion by Justice Cooper, joined by Justice Johnstone).

*Lane* thus establishes that even the violent acts of a third person can implicate a parent's duty under KRS 405.020 to nurture his or her child and that breaches of that duty can, at least in conjunction with other indications that the General Assembly intended criminal sanctions, amount to criminal conduct under KRS 501.030. *See also Tharp v. Commonwealth,* 40 S.W.3d at 356, (upholding, under *Lane,* the wanton-murder-by-complicity conviction of a woman accused of having failed to prevent her husband from murdering her child).

Here, of course, Bartley was accused, not of failing to prevent injuries inflicted by a third person upon her minor child, but of inflicting injuries herself upon her disabled adult child by failing to provide him with such rudimentary nurture as food and sanitary living conditions. Much more so than the breach of KRS 405.020(1) in *Lane*, the alleged breach of KRS 405.020(2) is patent here, and statutes such as those in KRS Chapter 209 outlawing the abuse and neglect of a disabled "adult," KRS 508.100 outlawing the abuse of a "person," and KRS 530.080 outlawing the endangerment of an "incompetent person's" welfare, serve to put parents on notice that the breach of their duty to nurture their disabled adult children can have criminal consequences. For the purposes of KRS 501.030(1), therefore, Bartley, as K.B.'s parent, was under a "legal duty" to care for K.B., and the Commonwealth's failure to specify the source of that duty does not amount to a palpable error. Neither was it a palpable error for the trial court to omit from the instructions a requirement that the jury find, as conditions giving rise to Bartley's duty, that Bartley is K.B.'s parent and that K.B. is "wholly dependent because of permanent physical or mental disability," because those facts were never in dispute. *Tharp v. Commonwealth*, 40 S.W.3d at 367.

Finally, Bartley maintains that, notwithstanding what may have been her general duty to care for K.B., it was her "theory of the case" that she had "entrusted the co-defendant Ms. Mitchell with [K.B.'s] care, and thus that her [Bartley's] legal duty to him was altered or extinguished." Bartley contends that the jury should have been asked to decide whether she had indeed relieved herself of her duty to care for her son. As discussed above, however, questions about the existence of a duty are, at least preliminarily, questions of law properly addressed to the trial court. Bartley has not referred us to any place in the record where she offered to the trial court a legal basis for her "theory of the case,"—some law establishing whether and under what circumstances a parent's legal duty to her disabled and dependent child might be "altered or extinguished." Further, she has made no attempt to provide such a basis on appeal. Absent some such legal ground for Bartley's "theory," the trial court could not have known which facts were relevant to that theory and thus, could not have determined which facts (if any) the jury should be asked to find. The trial court did not err, therefore, palpably or otherwise, by refusing Bartley's request to have the jury decide what amounted either to a question of law or to an unarticulated question of "fact" premised on a groundless theory.[13]

---

**13.** Although we uphold the assault instructions as given in this case, that does not necessarily mean that we endorse them. Assault by omission is not often charged, and so the trial court, in trying to frame appropriate instructions, was sailing in uncharted waters. We appreciate its adherence to the model instructions, but in omission of duty cases the model assault instruction should be modified along the following lines:

> You will find the Defendant guilty of First–Degree Assault under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That on or about ____ [date], ____ [List the circumstances giving rise to the alleged duty, for example, "(1) Defendant was the mother of [Victim]; and (2) [Victim] was wholly dependent because of permanent physical [and or mental] disability."].

B. That in this county on or about ____ [date] and before the finding of the Indictment herein, the Defendant breached her legal duty of care and support and caused a serious physical injury to [Victim] by ____ [State the manner in which the duty was breached, for example, "by failing to care for and support him."]; AND

## C. The Trial Court Did Not Err By Not Giving an Unrequested Instruction as to an Allegedly Lesser–Included Offense.

■ Bartley raises one last issue with respect to the assault charge and the jury instructions. As noted above, she was convicted of first-degree assault under an instruction that required the jury to find her guilty "if and only if" it believed beyond a reasonable doubt, among other things, that by wantonly creating a grave risk of death to another, and under circumstances manifesting extreme indifference to the value of human life, she "caused a serious physical injury to [K.B.] by severely neglecting to meet his needs." The jury was also instructed that if it did not believe Bartley guilty of first-degree assault, then it was to find her guilty of the lesser included offense of fourth-degree assault, "if and only if" it believed beyond a reasonable doubt that she wantonly "caused physical injury to K.B. by severely neglecting to meet his physical needs." Bartley maintains that these assault instructions in effect accused her of the crime of "severe neglect," and that the jury should also have been instructed with respect to what she characterizes as the lesser included offense of neglect of an adult, as defined and out-lawed in KRS Chapter 209.[14] We disagree.

■ As the Commonwealth notes, Bartley did not request an instruction on neglect of an adult pursuant to KRS Chapter 209. She did, it is true, tender a first-degree assault instruction that stated the method of assault as "by neglecting to meet [K.B.'s] physical needs," as opposed to the trial court's choice of "by severely neglecting . . ." However, the tender of an alternative first-degree assault instruction did not "fairly and adequately" apprise the trial court that she sought an instruction on an unidentified, allegedly lesser included offense regarding neglect of a disabled adult. The general rule, of course, is that "[t]he trial court is required to instruct the jury on lesser included offenses *when requested* and justified by evidence." *Miller v. Commonwealth*, 283 S.W.3d 690, 699 (Ky.2009) (citing *Martin v. Commonwealth*, 571 S.W.2d 613 (Ky.1978); internal quotation marks omitted and emphasis added). It is not an error, however, palpable or otherwise, for the trial court not to instruct on a lesser included offense that has not been requested. *Commonwealth v. Varney*, 690 S.W.2d 758, 759 (Ky.1985); RCr 9.54(2).[15] Because Bartley did not

C. That in so doing, the Defendant was wantonly engaging in conduct which created a grave risk of death to another and thereby injured [Victim] under circumstances manifesting extreme indifference to the value of human life.

Defenses which would add to or qualify the circumstances giving rise to the defendant's duty may be addressed as need be in part A of the instruction.

14. KRS 209.020 defines "neglect" as "a situation in which an adult is unable to perform or obtain for himself or herself the goods or services that are necessary to maintain his or her health or welfare, or the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult." KRS 209.990(2)–(4) outlaw, respectively, the "knowing," "wanton," and "reckless" neglect of an adult. "Knowing" neglect is a Class C felony and "wanton" neglect is a Class D felony. In this case, the jury had the option of first-degree assault a Class B felony, or fourth-degree assault, a Class A misdemeanor. Clearly, the KRS 209.990 offenses were not lesser vis-a vis fourth-degree assault. Whether they could be deemed lesser included offenses of first-degree assault is an issue we need not reach.

15. RCr 9.54(2) provides, "No party may assign as error the giving or the failure to give an instruction unless the party's position has been fairly and adequately presented to the trial judge by an offered instruction or motion, or unless the party makes objection be-

request a lesser included "neglect of an adult" instruction, the fact that no such instruction was given does not entitle her to relief.

Moreover, Bartley's appellate argument illustrates the problems posed by a rule contrary to RCr 9.54(2). She contends that the absence of a "neglect" instruction put the jury "between a rock and a hard place" by forcing it to choose between a serious offense (first-degree assault—a Class B felony) and either no offense (an acquittal) or a relatively minor offense (fourth-degree assault—a Class A misdemeanor). If the jury believed Bartley guilty of something more serious than fourth-degree assault, Bartley argues, it had to opt for first-degree assault even if it did not really believe Bartley's offense was that serious whereas, if had it been given the choice, it would have opted for something between those extremes. (Under KRS 209.990, knowing neglect of an adult is a Class C felony, and wanton neglect of an adult is a Class D felony.) But of course the jury could just as easily have resolved this supposed dilemma by leaning the opposite way, *i.e.,* by choosing fourth-degree assault even though it found the offense more serious than that because it believed first-degree assault was too serious. Not requesting a "neglect" instruction, therefore, even supposing that such an instruction might have been justified, is apt to have been a strategic choice. To now say that the absence of a "neglect" instruction amounted to a palpable error would enable Bartley to have it both ways. She could remain silent about a lesser included offense instruction at trial in hopes that the jury would opt for acquittal or for a minimal offense, but if the verdict disappointed her she could claim on appeal

that the lesser included offense instruction was mandated. Our rule requiring that lesser included offense instructions be specifically requested discourages such gamesmanship and where, as here, it is debatable whether a particular offense is a "lesser included" adherence to RCr 9.54(2) is all the more important.

### III. The Trial Court Did Not Abuse Its Discretion By Denying Bartley's Motion For A Continuance.

█ Bartley next contends that the trial court abused its discretion when it denied her motion for a continuance. On September 2, 2011, ten days before trial was scheduled to begin, Mitchell and Bartley jointly moved to postpone the trial. They requested additional time to seek an independent, expert evaluation of K.B.'s medical records, records which by that point had been in their possession for several months. On September 9, 2011, the Friday before the Monday when trial was to commence, the Commonwealth provided to the defendants more than a thousand pages of records from the nursing home where K.B. had lived from late October 2010 until July of 2011. Apparently these records supplemented other nursing home records that had been provided to the defendants months earlier. According to the Commonwealth, it had itself just received the new records that week. At an in-chambers hearing prior to the commencement of *voir dire* on September 12, 2011, both defendants renewed their motions for a continuance adding as a ground the need for extra time ("an enormous amount of time," according to Bartley's counsel) to review the new nursing home records.

fore the court instructs the jury, stating specifically the matter to which the party objects

and the ground or grounds of the objection."

The trial court denied the motion for a continuance. Specifically, the court noted that the original motion asserting the need for an expert had not been accompanied by the affidavit RCr 9.04 requires [16] and, moreover, the Commonwealth was willing to exclude the new nursing home records from evidence. Indeed, the trial court reasoned that the Commonwealth had no obligation to provide the records in the first instance because there was nothing to suggest that they were exculpatory (aside from the fact, as the Commonwealth conceded, that as a whole they showed that with proper care K.B. had improved). Finally, in the court's view the continuance motion was untimely. Bartley maintains that she was thus denied a fair trial, and indeed was deprived of her right to present a defense. We disagree.

Under RCr 9.04, the trial court may, "upon motion and sufficient cause shown by either party, ... grant a postponement of the hearing or trial." The trial court's discretion under this rule is very broad, and the denial of a motion for a postponement or continuance does not provide grounds for reversing a conviction " 'unless that discretion has been plainly abused and manifest injustice has resulted.' " *Hudson v. Commonwealth*, 202 S.W.3d 17, 22 (Ky.2006) (quoting *Taylor v. Commonwealth*, 545 S.W.2d 76, 77 (Ky. 1976)). Whether a continuance is warranted in a particular case depends on the totality of the circumstances, *Snodgrass v. Commonwealth*, 814 S.W.2d 579, 581 (Ky. 1991), *overruled on other grounds by Lawson v. Commonwealth*, 53 S.W.3d 534 (Ky. 2001), but often important are the following factors to be considered by the trial court:

length of delay; previous continuances; inconvenience to litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; availability of other competent counsel; complexity of the case; and whether denying the continuance will lead to identifiable prejudice.

*Snodgrass*, 814 S.W.2d at 581. Identifiable prejudice is especially important. Conclusory or speculative contentions that additional time might prove helpful are insufficient. The movant, rather, must be able to state with particularity how his or her case will suffer if the motion to postpone is denied. *Hudson*, 202 S.W.3d at 23 (collecting cases). Further, RCr 9.04 provides expressly that if the continuance is sought "on account of the absence of evidence" then the motion is to be accompanied by an "affidavit showing the materiality of the evidence expected to be obtained, and that due diligence has been used to obtain it."

Here, although as Bartley notes the case had been pending for less than a year (Bartley was indicted in December 2010), and no previous continuance had been granted, we are not persuaded that the denial of the defendants' tenth-hour motion to postpone a September trial that had been scheduled since April amounted to an abuse of discretion. The inconvenience to parties and witnesses, including numerous medical care providers and emergency service personnel, of postponing an imminent trial raising fairly straightforward issues was likely. Both defendants failed to pursue their motion diligently; they had known since the outset of the case that medical proof concerning causation and the extent of K.B.'s inju-

---

**16.** On the morning of trial, Mitchell's counsel apparently sought to supplement her motion with an affidavit provided by her father, a physician, to the effect that a medical expert might perhaps disagree with Bartley's treating physician as to the causes and extent of K.B.'s injuries.

ries would be important, and they had known for nearly as long that the nursing home might have pertinent records. Finally, the defendants failed to comply with RCr 9.04's affidavit requirement. The trial court could reasonably decide that those factors outweighed the defendants' completely speculative contentions that if given more time they might find a medical expert who would "contradict [the treating physician's] medical opinions," or might find "something helpful" in the last installment of nursing home records.

Against this conclusion Bartley refers us to *Anderson v. Commonwealth*, 63 S.W.3d 135 (Ky.2001), a rape and sex-abuse case in which we held that the trial court had abused its discretion by denying the defendant's motion for a continuance when, just a few days before trial was scheduled to begin, the Commonwealth provided medical records. However, the records in that case included both a doctor's report contradicting a previously disclosed report from another doctor and a nurse's statement to the effect that the alleged victim had acknowledged having had sexual intercourse with someone other than the defendant. The Commonwealth's discovery practice was, at best, questionable and the defendant had a clear and substantial interest in being accorded an adequate opportunity to develop the newly disclosed and apparently favorable evidence. With none of the other factors weighing much to the contrary, we concluded the scales tipped in favor of the defendant's motion.

This case is not at all like *Anderson*. There is no suggestion that the Commonwealth failed to disclose exculpatory evidence, and Bartley has not identified in any specific detail a defense theory or mitigating evidence that she was not given an adequate opportunity to develop and pursue. In these circumstances, where no identifiable prejudice has been shown, the trial court cannot be said to have abused its discretion by deciding against the obvious inconvenience of postponing a trial on the verge of its commencement.

## IV. The Trial Court Did Not Abuse its Discretion By Denying Bartley's Motion For a Mistrial.

 Bartley's final contention is that improper testimony by one of the Commonwealth's medical witnesses necessitated a mistrial and that the trial court abused its discretion by not so ruling. One of the registered nurses who provided care to Bartley during his stay at the Monroe County Medical Center was asked by the prosecutor to describe the condition of K.B.'s skin. The nurse testified that over many areas of K.B.'s body—under his arms, around his torso, down the back of his legs—his skin had sagged from an apparent loss of weight and had developed loose folds. She described his skin's texture as unusual, rough, "like cheap leather." She also testified that K.B.'s buttocks bore scratches and that on his buttocks and torso were numerous circular scars.

When the prosecutor asked the nurse what might have caused the scars, Bartley objected, and the trial court sustained the objection. The prosecutor then asked her to describe the scars' dimensions. The nurse said the scars were "the approximate size of the end of a cigarette." Bartley immediately objected, and as counsel were approaching the bench, the trial court addressed the jury as follows: "Ladies and gentlemen of the jury, you are not to consider that last answer for any purpose whatsoever." At the ensuing bench conference there was the following exchange:

> Bartley's Counsel: Your honor, I want to move for a mistrial based on that. She was instructed not to answer that

question, [but] the Commonwealth went right ahead and asked.

Commonwealth: I just asked her what the dimensions were.

Bartley's Counsel: Well I know what you asked, and I know why you were asking it. You wanted to get that in. I think it was totally inappropriate, and I want to move for a mistrial.

Court: I'm going to overrule this motion for a mistrial. If you want any further admonition, I already gave them one not to consider it, but if you want any further admonition, I will be happy to do that.

Mitchell's Counsel: Your honor, I mean, I would also just concur in asking for a mistrial. I don't believe that can be corrected by an admonition.

Court: Okay, thank you.

As counsel returned to their places, the trial court again addressed the jury: "Once again, all of you must promise me that you will not consider the last answer that was given for any purpose—*any purpose*—in your deliberation. Will all of you do that, please? All right. Thank you."

■ A mistrial, of course, as Bartley acknowledges, is an extreme remedy to be resorted to only when a fundamental defect in the proceedings has rendered a fair trial manifestly impossible. *Parker v. Commonwealth*, 291 S.W.3d 647 (Ky.2009). We review the trial court's decision to deny a mistrial under the abuse of discretion standard. *Id.*

For purposes of review, we will accept the trial court's apparent conclusion that the nurse was not qualified to offer an opinion as to the cause of the scars she observed on K.B.'s torso and buttocks and that her testimony implying that they resulted from cigarette burns was improper.[17] As Bartley acknowledges, violations

of the evidentiary rules are generally cured by an admonition, such as the admonition the trial court delivered in this case, and so, generally, do not provide grounds for a mistrial. *Bray v. Commonwealth*, 177 S.W.3d 741 (Ky.2005) (since admonition, had it been requested, would have cured improper reference to defendant's prior bad act, that reference did not necessitate a mistrial); *Johnson v. Commonwealth*, 105 S.W.3d 430 (Ky.2003) (admonition cured improper reference to defendant's guilty plea to an unrelated offense).

■ We have recognized two sets of circumstances in which an admonition will not be presumed to have cured a reference to inadmissible evidence.

(1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant, ... or

(2) when the question was asked without a factual basis *and* was "inflammatory" or "highly prejudicial."

*Johnson*, 105 S.W.3d at 441 (citations omitted). Because in this instance there was a factual basis for the Commonwealth's question, the second exception does not apply. Bartley insists, however, that the first exception does apply, because, she claims, "no juror could be expected to wipe clean from his or her mind the mental image of Ms. Bartley or Ms. Mitchell burning K.B. with a cigarette," and because the improper reference changed the complexion of the case: "Suddenly Ms. Bartley went from a bad mother in the minds of the jurors to a monster capable of torturing her own son." Although the idea of a mother deliberately burning her son is dis-

17. Whether this premise is correct is not an issue before us.

turbing, we do not agree with Bartley that the nurse's reference to that possibility necessitated a mistrial.

First, the court's admonition did not ask the jurors to erase from their minds the nurse's testimony. Bartley is surely correct that the jurors could not reasonably be expected to do that, but if that were the standard then admonitions could seldom be deemed effective because once heard improper testimony cannot be "unheard." The jurors were admonished, not to forget what they had heard, but rather to disregard it, *i.e.*, that whatever they thought about the nurse's cigarette-burn testimony they were to base their decisions solely on other evidence. People disregard what they know or what they think they know all the time. They may ask themselves "if I had known the hours involved, would I still have applied for this job?" or "were it not for my sister's constant criticisms, would I still dislike the new neighbors?" Only if there is an "overwhelming probability" that the jurors will be unable to perform that common mental feat and meaningfully ask themselves whether "apart from the forbidden testimony, do I believe the defendant guilty or not guilty," should an admonition be deemed inadequate. Here, it is not overwhelmingly probable that a juror would be unable to put aside the possibility of cigarette burns and to come to a decision based only on the other evidence. As appalling as a deliberate cigarette burn is, it is not something so uncommon or so shocking as to interfere with a juror's ordinary mental abilities. The fact that the nurse's testimony left in doubt when the supposed burns occurred and by whom they were inflicted would also have minimized any adverse effect on a juror's ordinary ability to disregard the testimony.

Nor does it seem to us that the nurse's improper testimony had a strong likelihood of "devastating" Bartley's defense. To the extent that Bartley's defense was that she was guilty of nothing more than "bad mothering," that defense was devastated by far, far more than the suggestion of cigarette burns. The abundant, graphic evidence of the atrocious conditions in which K.B. was found and the medical evidence of the serious consequences he suffered from having been left in those conditions were more than sufficient to convince the jury that K.B. had been criminally abused and had suffered serious physical injury. Simply put, that evidence easily eclipsed any improper reference to possible cigarette burns on K.B.'s body. This case does not, in other words, present an exception to the general rule that an admonition will cure a reference to inadmissible evidence, and the trial court did not abuse its discretion by denying Bartley's motion for a mistrial and opting to admonish the jury instead.

### *CONCLUSION*

In sum, Bartley was lawfully tried and convicted. Even assuming that her counsel had a conflict because he and counsel for co-defendant Mitchell were both public defenders working in the same office, Bartley is not, on that ground, entitled to relief. The alleged conflict was never brought to the trial court's attention, and there is no credible argument that counsel's performance was adversely affected. Nor is Bartley entitled to relief on the ground that she was unlawfully charged with or found guilty of first-degree assault. The assault *charge* was proper because under our law assault can be committed by failing to perform a legal duty—in this case, Bartley's duty under KRS 405.020(2) to provide care and support for her disabled son. The assault *conviction* was also proper because the jury instructions were not deficient. The trial court did not err by denying Bartley's request to have

the jury decide whether she owed a duty of care to her son, a question of law not of fact, and neither did it err by not including instructions on KRS Chapter 209 offenses which Bartley had not requested. Given the specific circumstances presented, the trial court's denial of Bartley's motion for a continuance did not deprive Bartley of an adequate opportunity to assess the evidence and to present a defense. And finally, Bartley's motion for a mistrial following a witness's improper reference to possible cigarette burns on K.B.'s body was properly overruled and the jury admonished to disregard the reference instead. Accordingly, we hereby affirm the Judgment of the Monroe Circuit Court.

All sitting. All concur.