**COMMONWEALTH of Kentucky,**
**Appellant**

v.

**Rita MITCHELL, Appellee**

2015–SC–000021–DG

Supreme Court of Kentucky.

April 27, 2017

COUNSEL FOR APPELLANT: Andy Beshear, Attorney General of Kentucky, Leilani K.M. Martin, Assistant Attorney General, Office of the Attorney General

COUNSEL FOR APPELLEE: Roy Alyette Durham, II, Assistant Public Advocate, Department of Public Advocacy

## OPINION OF THE COURT BY JUSTICE HUGHES

Kentucky Revised Statute (KRS) 501.030, one of the foundational provisions of the Penal Code, provides generally that a person may not be found guilty of a criminal offense unless

(1) He has engaged in conduct which includes a voluntary act or *the omission to perform a duty which the law impos-* *es upon him and which he is physically capable of performing*; and (2) He has engaged in such conduct intentionally, knowingly, wantonly or recklessly as the law may require, with respect to each element of the offense.

(emphasis supplied). These are the Penal Code versions of the ancient "*actus reas*" and "*mens rea*" requirements for criminal liability. As the emphasized portion of the statute indicates, the Penal Code allows for criminal liability premised upon a person's failure to act, but only in limited circumstances. At the time of the alleged omission, the defendant must have been under a legal duty to act (as opposed to a moral or some other sort of extra-legal duty), such that his or her inaction amounted to a breach of that duty. And even then liability is appropriate only if the duty was one which the person was physically capable of performing. In this case, the Court of Appeals reversed Rita Mitchell's conviction for having assaulted by neglect a severely disabled young man who lived with her, concluding that the Commonwealth had failed, contrary to KRS 501.030(1), to show that Mitchell had a duty to care for the young man. We granted the Commonwealth's motion for discretionary review to further consider the law of criminal omissions from the perspective this case affords. While we agree with the Court of Appeals that the Commonwealth did not properly plead its case against Mitchell, we are convinced that the remedy adopted by that Court— dismissal of Mitchell's assault charge— goes too far. Accordingly, we reverse the Opinion by the Court of Appeals. Because we reverse the assault portion of Mitchell's Judgment on different grounds that leave that charge subject to retrial, we also remand for additional proceedings.

## RELEVANT FACTS

In October 2010, in response to reports that a "boy" was being "kept" in de-

plorable conditions, Monroe County police officers, fire and rescue workers, and a social worker from the local Cabinet for Family and Health Services office were all summoned to a mobile home on Mudlick Flippin Road in Tompkinsville. The home was owned by Donna Bartley, but at the time its only occupants, aside from a large pack of dogs, were two people: Rita Mitchell, Bartley's long-time friend and until recently house-mate, and Bartley's then twenty-four year-old son, a young man we shall refer to as James.

Mitchell and James are both impaired and both have received Social Security Disability Benefits for several years. Although the full nature and extent of Mitchell's disabilities were not disclosed at trial, Mitchell testified that in October 2010 and for some time prior, she suffered from chronic obstructive pulmonary disease (COPD), a condition which limited her mobility and for which she required an artificial oxygen supply. She also suffered, she testified, from chronic depression, which in the fall of 2010 had become acute and disabling.

James suffers from cerebral palsy, significant intellectual disability, and possibly from autism. These significant conditions have, throughout his life, made him highly dependent on others for the provision of even life's most basic necessities, such as food, clothing, shelter, mobility, and health care. The record does not indicate how Bartley managed to care for James during his first seven years, but according to Mitchell's testimony, when James was about seven, Bartley and Mitchell, who had known each other from childhood, agreed to become house-mates. Bartley was to provide the residence and to manage the household in exchange for Mitchell's help with the cooking, cleaning, and care of James as well as Mitchell's contribution of her disability benefits to the household income. This arrangement worked well enough that it continued even after Bartley had a second and then a third child, a son and a daughter, for both of whom Mitchell helped to care. A social worker testified that he visited the Bartley residence in 2003, while Bartley and Mitchell were caring for all three children, and found the home clean and orderly and the children, including James, adequately provided for.

By late spring or early summer of 2010, however, Bartley and Mitchell's arrangement had begun to break down. During that period, Bartley and her two younger children, by then teenagers, moved to a new home in Glasgow, Barren County, Kentucky, while Mitchell and James were left behind in the Monroe County mobile home. The original plan, apparently, was to have the mobile home moved to Glasgow near where the others were living, but for whatever reason that move did not occur. Instead, Bartley increasingly disassociated herself from her son and Mitchell and from their difficult circumstances. Although she remained in control of the purse strings, including Mitchell's and James's social security benefits, Bartley ceased to make the mortgage payments on the mobile home; ceased to provide for trash removal; ceased to pay for water service, which was discontinued in August 2010; and visited the mobile home only on weekends, delivering food and a few gallons of water.

Mitchell was unable to cope with this virtual abandonment. We have described elsewhere the deplorable condition in which the rescue workers found the Monroe County mobile home in October 2010. *See Bartley v. Commonwealth,* 400 S.W.3d 714 (Ky. 2013). Suffice it to say here, that by then trash had piled up outside the residence, the residence had been overrun by more than twenty semi-feral dogs,

whose filth had accumulated on the floors and furniture, and Mitchell had apparently ceased making any effort to care for James, beyond perhaps giving him some water and the microwavable snack foods that Bartley provided. In a back room with the radio blaring to drown out the young man's screams, the rescue workers found James naked on a bare mattress across which had been spread a sheet of plastic. His skin hung in loose folds, his teeth had rotted, his toe-and fingernails were inches long, and he lay in a pool of his own excrement, the waste covering his body literally from head to toe, including his face and teeth. Medical evidence showed that James suffered such severe muscle deterioration that it was months before he regained the ability to stand and the limited ability to walk. From lying too long in one position, one of James's clavicles had become displaced and his shoulder had collapsed inward. He lost all of his teeth.

As bad as James's plight was (and to a person the rescue workers testified that they had never before encountered a scene as wrenching), the treating physician testified that for James the outcome easily could have been even worse. James's exposure to his excrement had put him at great risk, according to the physician, of E-coli infection, which can be fatal. And the disruption to James's digestive system, which had developed a gas blockage as a result of inadequate and irregular meals, also created, the doctor testified, a substantial risk of permanent, even fatal, bowel injury.

In December 2010 the Monroe County grand jury indicted Bartley and Mitchell.

Both women were charged with first-degree criminal abuse of James, under KRS 508.100,[1] and with first-degree assault, under KRS 508.010. With respect to both women, the latter charge alleged, among other things, that they had caused James serious physical injury by "severely neglecting to meet his physical needs."[2]

The cases were consolidated, and the women were jointly tried over two days in September 2011. The jury found both of them guilty of first-degree assault, found Bartley guilty of first-degree (intentional) criminal abuse, and found Mitchell guilty of second-degree (wanton) criminal abuse. In accord with the jury's recommendations, Bartley was ultimately sentenced to consecutive terms of twenty years for first-degree assault plus ten years for first-degree criminal abuse, and Mitchell was sentenced to twelve years for first-degree assault plus five years for second-degree criminal abuse. Bartley appealed as of right directly to this Court, and in *Bartley*, 400 S.W.3d at 714, we affirmed the judgment against her in its entirety.

In December 2012, the Court of Appeals granted Mitchell's request for leave to file a belated appeal, and then in December 2014, as noted above, the appellate panel affirmed Mitchell's second-degree criminal abuse conviction, but reversed her conviction for first-degree assault. With respect to the assault, the panel concluded that Mitchell could not be said to have assumed a legal duty to care for James, since she had done nothing to prevent Bartley, the biological mother, from providing that care

---

1. The grand jury charged that Mitchell, like Bartley, had intentionally seriously injured James, a physically and/or mentally helpless person, or had intentionally subjected him to torture, cruel confinement, or cruel punishment. These charges correspond to subparts (1)(a) and (1)(c) of KRS 508.100, the statute outlining criminal abuse in the first degree.

2. KRS 508.010 provides in pertinent part that "[a] person is guilty of assault in the first degree when: ... (b) Under circumstances manifesting extreme indifference to the value of human life he wantonly engages in conduct which creates a grave risk of death to another and thereby causes serious physical injury to another person."

in the first instance. In the Court of Appeals' view, Mitchell, having no duty as required under KRS 501.030(1), could not be found criminally liable for the alleged omission to perform that duty. They concluded that, "the circuit court erred by denying her [Mitchell's] motion for a directed verdict of acquittal upon the offense of first-degree assault."

The Commonwealth contends that in so ruling the Court of Appeals erred both procedurally and substantively: procedurally by reviewing a purported trial-court error that Mitchell did not adequately preserve, and substantively, among other reasons, by failing to consider *Staples v. Commonwealth*, 454 S.W.3d 803 (Ky. 2014), in which this Court discussed circumstances wherein a non-parent could have a duty under the criminal abuse statutes to protect a child even against abuses by the child's own parent.

We acknowledge the Commonwealth's concerns and agree with it that Mitchell was not entitled to a directed verdict, but further conclude that reinstatement of the assault conviction is not appropriate. Although Mitchell was not entitled to *no* assault instruction—the Court of Appeals' conclusion—she was entitled to an assault instruction that accurately reflected the law being invoked against her. In her case, unlike that of her codefendant, the victim's mother whose parental duties were clear, the trial court's failure to provide such an instruction, together with other consequences of the unspecified allegations, amounted to a palpable error at odds with Mitchell's right to fundamentally fair proceedings. Accordingly, we reverse the Court of Appeals' decision, which in effect dismisses the indictment against Mitchell for assault, but at the same time we vacate the trial court's Judgment convicting Mitchell of assault, and remand for additional proceedings as appropriate.

## ANALYSIS

As the discussions in *Bartley* and *Staples* indicate, our trial courts have been confronted in recent years by a new generation of crime-by-omission cases, cases involving new forms of parental neglect and abuse and cases brought against non-parents for alleged failures to protect or care for the children of others. These cases have posed difficult and intertwined questions of both substance and procedure. This case is yet another of that sort.

◾ As we explained in this case's companion case, *Bartley*,

> to proceed with a prosecution alleging a criminal omission, the Commonwealth must, under KRS 501.030(1), identify a specific "legal duty," the breach of which would subject the defendant to criminal sanction. Any dispute about the existence of the alleged duty should be resolved by the trial court, and disputes about the facts giving rise to that duty in the particular case should be incorporated in the instructions for jury resolution.

400 S.W.3d at 727–28.

With respect to Bartley, in her case we noted that trial counsel for the Commonwealth appeared not to have "identified the source or nature of the duty Bartley allegedly owed to [James]. He should have done so, inasmuch as KRS 501.030(1) has a clear "legal duty" requirement." 400 S.W.3d at 728. We then addressed whether Bartley had preserved the error by lodging an appropriate objection, and having determined that she had not, we considered whether she was nevertheless entitled to relief under the palpable error rule, Kentucky Rule of Criminal Procedure (RCr) 10.26.

In *Bartley*, we concluded that the Commonwealth's failure to identify at the out-

set the specific "legal duty" Bartley was alleged to have breached did not amount to a palpable error. As we explained, a parent's non-delegable duty to support and care for a disabled adult child has long been established in our law, both our statutory law and our case law. Moreover, the factual predicates implicating that duty in *Bartley*—Bartley's parental relationship with James and James's significant mental and physical disabilities—were not in dispute and were clearly reflected in the evidence. 400 S.W.3d at 728–30. Under the law and given the undisputed facts, any error as to Bartley was not palpable.

■ As the Commonwealth notes, Mitchell's appeal raises similar questions. In her case, too, it appears, the Commonwealth failed to make clear at the outset the specific "legal duty" Mitchell was alleged to have breached, and in her case, too, we are initially confronted with a question as to whether Mitchell adequately preserved that error. Inasmuch as Mitchell's objections during trial were essentially the same as Bartley's, we agree with the Commonwealth that she did not.

As we observed in *Bartley*, although both defendants cited the "lack of evidence of a duty" as a ground for a directed verdict on their respective assault charges, the directed-verdict discussion focused almost entirely on Bartley's primary contention that assault, by its nature, could not be committed by omission. The trial court having explained why it construed the assault statute to allow for assaults by omission,[3] neither defendant pressed for a ruling on the alternative "no-evidence-of-a-duty" ground. That specific directed verdict ground thus passed unaddressed and unpreserved. 400 S.W.3d at 728, n. 12.

The defendants did not fare much better during the jury-instruction conference. There, again as we noted in *Bartley*, Mitchell (joined by Bartley) tendered an instruction that would have required, among other things, a jury finding that she "had a legal duty to provide for [James's] needs." This request was not addressed until the very end of the conference. At that point, when the trial court appeared to be concluding, the defendants reminded the court of their request, which the court then summarily denied, observing only that in its view the tendered instruction was "improper." Neither defendant sought elaboration or offered any defense of the tendered instruction's "propriety." In *Bartley*, we noted that as far as it went the court's ruling was in accord with the usual rule that the court, not the jury, decides questions about the existence of a duty. Otherwise, we stated, "[t]he mere tendering of an erroneous instruction does not preserve a *post hoc* claim that a different instruction might have been warranted." *Id.* (citing *Long v. Commonwealth*, 559 S.W.2d 482 (Ky. 1977)).

We agree with the Commonwealth, therefore, that in Mitchell's case, as in Bartley's, the Commonwealth's (and the Court's) error of proceeding in a case of an alleged crime-by-omission without having specified the legal duty the defendant allegedly breached was not preserved. Accordingly, Mitchell is entitled to relief only if the error was palpable, *i.e.*, only if the error was, or should have been, apparent, and then only if it resulted in "manifest injustice," what we have characterized as either a skewed outcome or a proceeding "so fundamentally tainted ... as to 'threaten [the] defendant's entitlement to

---

**3.** As noted, *supra*, KRS 508.010(b) defines one form of first-degree assault as "[u]nder circumstances manifesting extreme indifference to the value of human life, [the defen-

dant] *wantonly engages in conduct* which creates a grave risk of death to another and thereby causes serious physical injury to another." (emphasis supplied).

due process of law.'" *Bartley*, 400 S.W.3d at 728 (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 3 (Ky. 2006)).

Implicitly, at least, the Court of Appeals concluded that the error—the failure to specify Mitchell's alleged duty to care for James—was indeed palpable. The panel relied on the statement in *West v. Commonwealth*, 935 S.W.2d 315, 317 (Ky. App. 1996), to the effect that affirmative legal duties of care can arise in at least four distinct circumstances:

> [F]irst, where a statute imposes a duty to care for another; second, where one stands in a certain status relationship to another; third, where one has assumed a contractual duty to care for another; and fourth, where one has voluntarily assumed the care of another and so secluded the helpless person as to prevent others from rendering aid.

935 S.W.2d at 317 (quoting *Jones v. United States*, 308 F.2d 307, 310 (D.C. Cir. 1962)). Although, the Commonwealth did not specify *any* theory whereby Mitchell could be found to have breached a legal duty to care for James, the appellate panel understood the Commonwealth to have alleged only the fourth type of circumstance mentioned in *West*, *i.e.*, that Mitchell had through her relationship with Bartley voluntarily assumed James's care. In its view, however, Mitchell could not reasonably be found to have secluded James from the aid of others—at least from his mother's aid—and thus, under *West's* fourth scenario, she could not be deemed subject to assault liability for having failed to provide care that it was really Bartley's duty to provide. The Commonwealth takes issue with the Court of Appeals' decision on a number of grounds.

First, as noted, the Commonwealth questions the propriety of the appellate panel's inserting itself into the directed-verdict decision on grounds not adequately presented to the trial court. As explained above, we agree with the Commonwealth that the error in this case—the Commonwealth's failure to specify the legal duty (or duties) Mitchell owed to James—was not adequately preserved for appeal. Our review, therefore (as the Court of Appeals' review should have been), is under the palpable-error standard. If the panel is correct, that the evidence at trial allowed for no rational belief that Mitchell breached a legal duty of care to James, then we would agree that Mitchell's assault conviction should be deemed palpably erroneous. We turn then to the Commonwealth's substantive objections to the decision below.

As we understand them, those objections are threefold. First, even if the Court of Appeals' strict and literal reading of *West's* fourth set of duty-creating circumstances accurately reflects the law, *i.e.*, even if no legal duty of care arises from the voluntary assumption of a care-giving role provided there is no concomitant seclusion of the helpless person from all other caregivers, the appeals panel erred by disregarding evidence that Mitchell did indeed isolate James not only from the world at large, but from his mother as well. Bartley's defense, in fact, based on snippets of Mitchell's statements to investigators and her trial testimony,[4] was that James's situation only became distressing during the two or so weeks prior to his rescue, and during that period Bartley relied—carelessly, perhaps, but not criminally—on Mitchell's repeated assurances that James was doing fine. That evidence was sufficient, according to the Commonwealth,

---

4. As we noted in *Bartley*, Mitchell's testimony can only be characterized as significantly, not to say wildly, inconsistent. 400 S.W.3d at 720.

to allow even a strict "voluntary assumption of duty" case against Mitchell to go to the jury.

More fundamentally, the Commonwealth contends that the appeals panel's narrow construction of *West's* fourth common-law duty category does not accurately reflect the law. Mitchell's voluntary assumption of James's care could rightfully be deemed to have ripened into a legal duty, a sort of *in-loco-parentis* duty, the Commonwealth implies, notwithstanding Bartley's concomitant and arguably superior duty as a parent. The prosecutor focused on the seventeen-year duration of Mitchell's care of James and the evidence that Bartley and Mitchell were, on some level, colluding to keep James from being cared for by others lest, as Mitchell testified, Bartley lose custody of James and his accompanying social security benefits. In these circumstances, the Commonwealth insists, Bartley's duty ought not shield Mitchell from the consequences of her own.

Finally, the Commonwealth contends that the appeals panel erred by limiting its consideration of Mitchell's duty to *West's* fourth category, the narrow duty to provide care imposed by the common law on volunteers. In *West* itself, the Court of Appeals recognized a non-parent "caretaker's" duty to care for a disabled adult under KRS Chapter 209, The Protection of Adults chapter.[5] Further, in *Staples*, this

Court recognized a non-parent "actual custodian's" duty under KRS 508.090—KRS 508. 120—the Penal Code's abuse provisions—to protect a child under twelve or a "helpless person" from abuse by others, including a parent. The Commonwealth's suggestion is that Mitchell likely qualifies as either a "caretaker" or an "actual custodian" under these Statutes and thus likely has statutory duties of care toward James independent of Bartley's parental duties.

We need not resolve the merits of any of these alternatives to agree with the Commonwealth that the evidence against Mitchell was sufficient to support potentially viable assault-by-omission theories. We thus further agree that the Court of Appeals panel erred by disregarding that potential and dismissing Mitchell's assault charge altogether. Accordingly, the Court of Appeals' opinion must be reversed.

■ As the Commonwealth's argument also makes abundantly clear, however, the Commonwealth's failure to specify the duty of care it was alleging against Mitchell had an utterly different effect on Mitchell's case than its similar failure with respect to Bartley had on hers. In *Bartley*, the Commonwealth's error meant little, since it was clear to all—parties, court, and jury alike—that Bartley was being prosecuted for injuries arising from the alleged breach of her parental duty, a legal duty

---

5. Pertinent provisions are KRS 209.020(6) (defining "caretaker"); KRS 209.020(16) (defining "neglect"); and KRS 209.020(8) (defining "abuse").

"Caretaker" means an individual or institution who has been entrusted with or who has the responsibility for the care of the adult as a result of family relationship, or who has assumed the responsibility for the care of the adult person voluntarily or by contract, employment, legal duty, or agreement.

"Neglect" means a situation in which an adult is unable to perform or obtain for himself or herself the goods or services that are necessary to maintain his or her health or welfare, or the deprivation of services by a caretaker that are necessary to maintain the health and welfare of an adult.

"Abuse" means the infliction of injury, sexual abuse, unreasonable confinement, intimidation, or punishment that results in physical pain or injury, including mental injury.

KRS 209.990(2)–(4) outlaws, respectively, the knowing, wanton, and reckless neglect of a disabled adult.

well and clearly established.[6] With respect to Mitchell, however, the Commonwealth's failure to specify the legal duty (or duties) Mitchell was alleged to have breached meant much more.

■■■ It meant that no one had a clear idea how to respond to the evidence the Commonwealth presented, and so had to respond uncertainly. Mitchell could not tailor her defense to specific claims that a particular duty had arisen and been breached; the trial court had to rely on generalities in assessing Mitchell's directed-verdict motion; and most importantly, the jury, having not been apprised that a particular legal obligation was being alleged and that moral obligation alone was not enough, was left to its own devices when asked to find whether or not Mitchell had "caused serious physical injury to [James] by severely neglecting to meet his needs."[7] Each of these uncertainties constitutes a serious flaw in the proceedings, and their combination, we are convinced, denied Mitchell a fundamentally fair trial as to the assault charge. The Commonwealth's error in not specifying the legal duty it believed Mitchell had breached (and the court's error in not insisting that it do so), was thus palpable—a clear violation of KRS 501.030(1)'s "legal duty" requirement, and a violation that so tainted the trial as to threaten Mitchell's entitlement to due process.[8]

6. *Cf. Staples*, where even though there was uncertainty at trial and a misstep or two concerning how allegations that a non-parent had breached his duty as an "actual custodian" were to be presented to the jury, that duty had at least been specified and brought before the jury. Those actions in the trial court made the usual sort of *Commonwealth v. Benham*, 816 S.W.2d 186 (Ky. 1991), directed-verdict review possible. That is not the case here.

7. Jury Instruction No. 3 provided in pertinent part:
   You will find the Defendant guilty of Assault in the First Degree under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
   A. That in this county on or about the 20th day of October, 2010 and before the finding of the Indictment herein, she caused a serious physical injury to [James] by severely neglecting to meet his needs; AND
   B. That in so doing, the Defendant was wantonly engaging in conduct which created a grave risk of death to another and thereby injured [James] under circumstances manifesting extreme indifference to the value of human life.

8. In what amounts to an aside in her brief, Mitchell maintains that her criminal abuse conviction should be reversed on the same ground as her assault conviction. The appellate panel affirmed (without comment) Mitchell's abuse conviction, however, and Mitchell did not file a cross-motion for discretionary review. This additional claim, therefore, is not properly before us. *Fischer v. Fischer*, 348 S.W.3d 582, 596 (Ky. 2011) (noting that a cross-motion is required for discretionary review of that portion of the Court of Appeals' opinion that aggrieves the appellee, *i.e.*, denies relief or imposes a burden).

In any event, Mitchell's contention is without merit. Mitchell was found guilty of second-degree criminal abuse under KRS 508.110, which provides in pertinent part that "[a] person is guilty of criminal abuse in the second degree when he wantonly abuses another person or permits another person of whom he has actual custody to be abused and thereby ... (c) Causes torture, cruel confinement or cruel punishment, to a person twelve (12) years of age or less, or who is physically helpless or mentally helpless." The statutes define "abuse," in pertinent part, as "the infliction of physical pain, injury, or mental injury, or the deprivation of services by a person which are necessary to maintain the health and welfare of a person." KRS 508.090(1). As we have noted previously, abuse, like assault, is a "result" crime, *Ratliff v. Commonwealth*, 194 S.W.3d 258, 273 (Ky. 2006), with the outlawed results as found by the jury here being "torture, cruel confinement, or cruel punishment to a person ... who is physically helpless or mentally helpless." As a result crime, abuse can be committed either by commission or by omission, and

On remand, the Commonwealth may elect to proceed under a statutory caretaker's duty pursuant to KRS Chapter 209, a common-law caretaker's duty pursuant to the fourth scenario outlined in West, or perhaps both, given that these duties are not mutually exclusive. While the trial court would ordinarily expressly determine in the first instance whether either or both of those duties may exist on the facts presented, *Bartley*, 400 S.W.3d at 727–28, in this case the trial court only implicitly answered the legal duty question pretrial. However, this Court has expressly answered that threshold issue on appeal by declining to affirm the Court of Appeals' opinion finding that Mitchell had no duty to James. In our view, there is clearly evidence in the record of this case that could support the finding of a legal duty on the part of Mitchell. Going forward, resolution of the first-degree assault charge requires first, a jury instruction designed to resolve any factual disputes necessary to give rise to a duty. For example, if the Commonwealth should proceed under a KRS Chapter 209 theory of the duty, one disputed fact will most likely be whether Mitchell "assumed the responsibility for the care of [James] voluntarily or by . . . agreement", KRS 209.020, while a common-law theory would require a determination as to the voluntary assumption of a duty of care and the necessary seclusion of James to prevent others from rendering

aid. If those or other disputed facts are resolved by the jury in a manner giving rise to a statutory and/or a common-law duty, then the jury must receive a specific instruction on the nature of the duty which Mitchell owed to James and the alleged breach of that duty. Only then has the jury been given the necessary instruction on the law applicable to the criminal omission form of first-degree assault with which Mitchell has been charged.[9]

### CONCLUSION

In sum, we agree with the Court of Appeals, *albeit* on different grounds, that Mitchell is entitled to relief, but we also agree with the Commonwealth that the relief awarded by the appeals panel was not legally appropriate. The problem was not that the Commonwealth failed to introduce sufficient evidence of an assault, because the conduct presented would clearly qualify under KRS 508.010(b). The problem, rather, was that the Commonwealth failed adequately to specify the duty giving rise to assault-by-omission it was alleging, and that failure undermined the fairness of Mitchell's trial. Mitchell's remedy is thus not the dismissal of the assault charge, but rather the reversal of her assault conviction and sentence. Accordingly we reverse the Court of Appeals' Opinion and remand this matter to the Monroe Circuit Court

---

the evidence in this case would support a finding that Mitchell wantonly abused James, *i.e.*, disregarded a substantial risk of torturing him, cruelly confining him, or cruelly punishing him, not merely by breaching her alleged duty to care for him, but directly, by locking him in a back room to wallow in his own waste with the radio blaring to drown out his cries of distress. Because Mitchell's abuse conviction was thus not dependent, as was her assault conviction, on Mitchell's being under a legal duty to care for James, the Court of Appeals correctly allowed it to stand.

**9.** The pattern instruction for "First–Degree Assault; Omission; Legal Duty; Wanton" appearing at § 3.34A in Cooper, *Kentucky Instructions to Juries—Criminal* (5th ed. Update 2014) is premised on *Bartley* and a parent's duty to a disabled adult child but it can be adapted to address the type[s] of duty breaches pertinent to Mitchell's case. It is important to note that a proper instruction includes the language from KRS 501.030(1) regarding the defendant being "physically capable of performing" the relevant duty.

for additional proceedings consistent with this Opinion.

All sitting. All concur.