# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS
OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT.  OPINIONS CITED FOR
CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN
UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A
COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG
WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO
THE  ACTION.

RENDERED: JUNE 15, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0421-DGE

JULINA M. WINLAND AND                                             APPELLANTS
KEVIN LUCAS


                          ON REVIEW FROM COURT OF APPEALS
V.                  NOS. 2021-CA-1153 & 2021-CA-1154
                          HARLAN CIRCUIT COURT
                    NOS. 21-D-00147-001 & 21-D-00148-001


MYKAL L. RINGSTAFF                                                   APPELLEE


### MEMORANDUM OPINION OF THE COURT

### AFFIRMING

Mykal Ringstaff (Mykal) filed petitions for emergency protective orders against Kevin Lucas (Kevin) and Julina Winland (Julina) on behalf of Julina's five children. Following hearings on the respective petitions, the Harlan Circuit Court entered domestic violence orders (DVOs) against Kevin and Julina, respectively. Kevin and Julina challenged the DVOs before the Court of Appeals, which affirmed. After thorough review, this Court also affirms.

# I.    FACTS AND PROCEDURAL BACKGROUND

The Appellee, Mykal, is Julina's father and the grandfather of Julina's five children: Alex (15), Beth (14), Casey (11), Diane (9), and Ethan (7).[1]  Until sometime around 2019, Julina lived in a home in Harlan County, Kentucky with her children and her now estranged husband, Edwin "Alan" Winland, Jr. (Alan), who is not a party to these proceedings.

Numerous photographs entered into evidence during the DVO hearings discussed below demonstrated that Julina's marital home was unfit for human habitation.  One of the children's bedrooms had trash, clothing, and other debris covering every inch of the floor, and several piles of dog feces were plainly visible on top of the trash.  According to the oldest child, the trash in that bedroom was "about two feet deep," and beneath that there would be roaches and fleas in the spring and summer.  The kitchen was in the same state: every available inch of space on the counters and floor was covered with trash and miscellanea.  The trash pile in the living room covered the entirety of the floor and was at least three to four feet tall.  In addition, a large portion of the ceiling in the living room had peeled off, exposing rafters and wiring.  There was another large hole in the ceiling of Julina's bedroom which was also filled with clutter.  The photographs were taken by Mykal in August 2021.

---

[1] Each of the children are identified using a pseudonym to protect their privacy. The ages provided were the children's ages on the date the petitions for protective orders were filed.

2

Due to the state of Julina's marital home Julina's mother, Mykal's ex-wife, threatened to contact child protective services. In response, Julina and the children stopped living in the marital home full time and began living a nomadic, and essentially homeless, lifestyle. She and the children would stay in the marital home one night a week, and other nights they would sleep in Julina's vehicle in various parking lots, or they would sleep in the basement of the church where Mykal was a pastor. This went on for about two years until January 2021 when Kevin came to Harlan to advise Julina's sister on a construction matter. Kevin and Julina had known each other as children through their parents but had only spoken twice over the last twenty years through Facebook. Nevertheless, upon learning that Julina and her children were homeless, he offered to let them stay at his home in Tennessee.

After staying at Kevin's home for approximately a week, Julina and the children left and stayed at Julina's mother's home in Georgia from January to about the middle of May. They then went back to Kevin's home at the end of May. The children went to a summer camp in Tennessee during June and July, and towards the end of July, the children went to stay with Mykal for a few weeks. For reasons discussed in more detail below, Mykal feared for the children's safety when the time came for them to be returned to Julina. Mykal tried to get the Cabinet for Health and Family Services (the Cabinet) involved to protect the children, but the Cabinet refused his pleas for help. Therefore, on August 6, 2021, after consulting with the county attorney, Mykal filed petitions for orders of protection in Harlan District Court against Kevin and Julina on

3

behalf of Julina's children. Mykal's petition concerning Kevin alleged the following:

> Kevin is an extreme danger to my grandkids. He is extremely short-tempered and states that he is not responsible for his actions if he gets upset. He carries a gun and does a countdown when he's angry saying "I could just kill someone." He forced my grandkids to clean up his dogs' feces in apt. and got upset at my oldest grandson [Alex] and threatened him because he was guarding [the] bathroom door to keep Kevin from going in on his sister [Beth]. [Alex] has recordings if needed of Kevin making threats to him. [The] children are afraid and do not want to be around Kevin. I need to protect my grandkids from further abuse from Kevin.

Mykal's petition requested that the court grant Mykal temporary custody of all five of the children. Mykal's petition against Julina stated:

> Julina moved to Ooltewah, TN [with] live in boyfriend [apartment] covered [with] dog feces that grandchildren were forced to clean by Kevin Lucas (boyfriend). Kevin is angry and violent towards grandchildren. My failing to keep them safe from Kevin. Most of time they are living in vehicle homeless. Kevin carries firearm on person and states he is not responsible for his actions if he gets angry. My grandkids are unsafe in Julina's [and] Kevin's care. They are behind in school [and] in medical care. They need attention. I need protection for my grandchildren. They are unsafe in Kevin's [and] Julina's care. Please help me keep my grandchildren SAFE!

The petition against Julina also requested that temporary custody of the children be awarded to Mykal.

The district court did not issue an emergency protective order (EPO) against Julina; however, it did issue an EPO against Kevin. Under the terms of Kevin's EPO, Mykal was granted temporary custody of the children. DVO hearings for Kevin and Julina were set for August 19, 2021. During the August 19 appearance, on Mykal's motion, the district court ordered that an investigator for the Cabinet, Tommy Key (Investigator Key), investigate in both

4

matters by interviewing the children, Kevin, and Julina. The hearings were continued until September 9.

On September 9, Mykal's counsel informed the court that, as he was the children's temporary custodian, he had filed a motion to intervene in Julina's and Alan's divorce case[2] which was then pending in Harlan Circuit Court. Mykal accordingly moved to have the DVO cases transferred to the circuit court, and the district court granted the motion.

On September 20, the circuit court held a DVO hearing in Kevin's case. The court heard testimony from Mykal, Investigator Key, Julina's three oldest children, and Kevin.

Mykal testified that he was seeking a DVO against Kevin because he was greatly concerned for the children's safety. Mykal alleged that although Kevin has never physically injured any of the children, he has "tremendous anger management issues," behaves erratically, and carries a firearm. Mykal gave the example of Kevin previously stating that someone has two minutes to respond, or he is not responsible for his actions, and that he has had a stroke and cannot be held responsible for losing his temper. Mykal also noted that Kevin took Alex (15) to shoot guns and gave him a beer; that Kevin posted a Facebook video of Ethan (7) on "heavy equipment" with "no protective gear" while it was running; and that Alex called Mykal and told him he was blocking

---

[2] Harlan Circuit Court Case No. 21-CI-0132.

5

the bathroom door to prevent Kevin from walking in on Beth (14) because Alex was afraid Kevin would molest her.

Mykal was also greatly concerned about Kevin's habit of carrying a firearm. While the children were at summer camp in Tennessee in June and July 2021, Kevin came to the camp with a firearm which Mykal contended was "strictly forbidden" at the camp. However, there was no evidence that Kevin threatened anyone with the gun, waived it around, or even removed it from its holster. In addition, the state of Kevin's home was not much better than Julina's marital home in Harlan: it was poorly maintained and "covered" in dog urine and feces which Mykal claimed Kevin forced the children to clean.

The imminent threat Mykal perceived to the children when he filed for the protective orders was Julina and Kevin attempting to take the children back to Kevin's home in Tennessee. The children told him that they did not want to go back, that they were afraid of Kevin, and that they did not want to be around Kevin. And it was an unstable environment: the youngest children told him they slept on half-inflated air mattresses on a floor that had dog feces on it, while Beth (14) refused to sleep in Kevin's house and instead slept in a car. Mykal filed the protective orders to keep the children away from Kevin, not Julina, but he nonetheless believed Julina was unstable and unable to take care of the children at that time.

Mykal testified that he reported his concerns to the Cabinet in Harlan County in August 2021 while the children were staying with him, but the

6

Cabinet told him there was nothing it could do because Kentucky was not their home state.

Cabinet Investigator Key testified that he interviewed each of the children and that they appeared to be apprehensive to talk to him about Kevin and Julina. The children expressed environmental fear and that they were afraid of Kevin, that Kevin loses his temper, and that he carries a gun. Investigator Key said that he did not uncover any evidence that Kevin physically harmed any of the children or threatened any of the children with physical violence. However, Alex reported that he and Kevin got into a verbal altercation on three separate occasions. Investigator Key uncovered no reason why Kevin would be legally prohibited from carrying a firearm.

The children also described the conditions they had been living in while they stayed on Kevin's property to Investigator Key. Each child described dog feces and trash in every room of the home and stated that they would sometimes instead stay in a semi-tractor trailer container on the property that Julina would run an extension cord to for electricity. The children reported that usually, Kevin and Julina would sleep in the home and would sometimes lock the children out so that they would have to sleep in a car or in the tractor trailer container. The children also confirmed that the marital home was in the condition depicted in the aforementioned photographs while they were living there. We note here that Kevin's counsel objected to any line of questioning about the children's living conditions on the grounds that the statutory definition of domestic violence does not include poor living conditions. The

court overruled the objection and stated that "physical injury can be environmental . . . a bad environment can effect someone's health, of course it can." Investigator Key contacted authorities in Tennessee in an attempt to get pictures of Kevin's home and property. Tennessee authorities went to the home three separate times, but no one would answer the door.

Investigator Key also felt that he could substantiate medical and educational neglect against Julina, although he acknowledged such allegations would have no bearing on Kevin. He explained that the children were not up to date on the vaccinations required for public school and had a lot of dental issues. The children had not been in school for at least two years, and Investigator Key was trying to get records from Tennessee to verify their reports of being homeschooled. The Harlan Independent School System was in the process of testing the children to determine how far behind they were educationally.

The court then interviewed the three oldest Winland children—Alex, Beth, and Casey—individually and outside the presence of the parties and their respective counsel. The oldest, Alex, confirmed that the photographs of the marital home depicted its condition while they were living in it. He further stated that they stopped living in the marital home because Julina was afraid the children would be taken from her "because she was neglecting [them]." Alex stated that was when they started staying in the marital home only one night per week and would either sleep in the car or in the basement of Mykal's

8

church every other night.  Then, in January 2021, they went to stay with Kevin.

Alex described Kevin as "a person who came into [his] life about nine months ago."  Alex believed Kevin was his mother's boyfriend, but that she would not acknowledge that he was due to her pending divorce.  He said that Kevin's home was just as bad as the marital home, and described it as follows:

> The house is dirty, messy.  He used to have kids living there, his own, they don't live there anymore, but there was a bunch of their stuff.  Their rooms were trashed, the whole thing was trashed, there was dog feces everywhere, the whole thing smelled like there was some kind of mold or something going around, it smelled musty.  I could maybe be in there for 5 minutes before I could barely breathe.

Because of the state of the house, Alex would sleep in the car.  Alex verified that the children would also stay in an insulated tractor trailer container on Kevin's property and explained that Kevin was living in a "somewhat dismantled" RV next to the house.

Alex confirmed that Kevin had never physically injured him, but told the court that Kevin had "verbally abused" him and used "strong language" in front of him and his siblings.  Kevin told Alex that he would end up in a juvenile detention center and would not be a success in life because Alex acted just like his father Alan.  More troubling, Alex said that Kevin told him, "That I have to live with him until I'm eighteen and if I didn't straighten up, he would make my life miserable."  In response, the court asked, "And your mother, how does she, she allows all this to go on?"  Alex responded, "Yes, she allows it.  She says I must behave; Kevin is doing what's right for me."  Finally, Alex told the court

9

that he had always been homeschooled by Julina, but she only taught him math and language. He said the last time he had been to the doctor was in either 2015 or 2016.

Beth and Casey were much shier than Alex and their respective testimonies were much shorter. Beth stated that she did not really get along with Kevin. Both girls confirmed that the photographic evidence depicted the state of the marital home while they lived there, that Kevin's home was not clean, and that they stayed in a tractor trailer container on his property.

Kevin testified on his own behalf that he had never threatened the children with physical harm, and that the verbal altercations he got into with Alex were the result of Alex harassing him and calling him names. He acknowledged his home was littered with dog feces and that he had been unable to clean it because he had a medical injury. He denied making the children clean the home and asserted that the rooms the children stayed in did not have dog feces in them. He also stated that the two older children slept in the car because that is what they chose to do. He offered to let Julina and the children stay with him because they were homeless, but he does not want custody of the children, as he has seven of his own. At some point, he got into an altercation with Julina's children's father Alan and was charged with assault, but it was later dismissed.

Regarding his firearm, Kevin agreed that he does generally carry it, but asserted that he is licensed to do so in Tennessee, and that he is not a convicted felon. He further acknowledged that he had his firearm when he

10

went to the children's summer camp, but no one said anything to him about it while he was there. He had never threatened anyone with his gun.

Following the hearing, the circuit court found on a standard AOC-275.3 Form that Mykal had established "by a preponderance of the evidence, that an act(s) of domestic violence and abuse . . . has occurred and may again occur[.]" Kevin was ordered to stay 500 feet away from Mykal and the children for three years. Following the court's ruling concerning Kevin, Mykal's counsel requested that Julina's hearing be continued for one week until September 27, 2021, so that they could attempt to reach an agreement with Julina for supervised visitation at Mykal's home in lieu of pursuing the DVO. The court agreed to keep the temporary custody order in place until the parties reconvened on September 27 on the condition that any visit with Julina and the children be supervised.

On September 27, the parties reported that they could not reach an agreement and requested that the court proceed with a DVO hearing. During that hearing the court heard testimony from Mykal, Investigator Key, and Alex. Julina chose not to testify.

Mykal reported to the court that the children's father Alan had submitted a document in the divorce proceedings requesting that the court grant custody of the children to Mykal.[3] Mykal also told the court that even after the DVO

---

[3] That document as read into the record during the DVO hearing stated: "Comes now the Respondent Edwin Alan Winland does hereby enter his appearance and request that the court grant custody of the children to the Intervening Respondent Mykal Ringstaff. That Mykal Ringstaff is the maternal grandparent of the children and

11

was entered against Kevin, Julina continued to stay with him. Additionally, Mykal conveyed that after Kevin's DVO hearing Mykal allowed Julina to come to his home to visit the children. The visit went well at first but deteriorated into an altercation between Julina and Alan over a trailer hitch that resulted in Alan going to jail and Julina filing a petition for a DVO against Alan, which was denied.[4] Mykal said that Alex became so upset following the visit that he considered placing him in a 72-hour psychiatric hold.

Apart from the foregoing, Mykal's testimony was for the most part repetitive of what he previously stated during Kevin's hearing. He again testified that he sought the DVO because the children were not in a safe environment with Julina and Kevin, and he feared for their safety. Each of the children told him that they did not want to be around Kevin, that Kevin has anger issues and loses his temper frequently, and that Kevin carries a firearm. Mykal claimed that on one occasion Beth became upset about something and stated to Mykal, "I wish Kevin would have just shot me when he had the chance." Beth was not forthcoming when Mykal asked her follow up questions about that statement.

Photographs depicting the state of Julina's marital home were again introduced. As with Kevin's hearing, Julina's counsel objected to the admission of the photographs and argued that environmental neglect does not

---

that [inaudible] children in this matter. That the Respondent states that the Petitioner Julina Winland is unfit to raise the children."

[4] *See Winland v. Winland*, 2021-CA-1319-ME, 2022 WL 2182907 (Ky. App. June 17, 2022).

constitute domestic violence. The court overruled the objection, stating that environmental harm could be domestic violence "because it's just unhealthy, and it can certainly harm children. Emotionally, mentally, physically, in all kinds of ways." Mykal reiterated that for two years the children and Julina would either stay in the martial home, in a car, or in the basement of his church. He claimed that he did not know that Julina and the children had been homeless because the children were forbidden from telling him. And, that he was unaware that they were staying in his church because Julina had a key. He again stated that the children were behind on their vaccinations and that they were behind educationally notwithstanding that Julina had homeschooled them.

Mykal testified that prior to filing his petitions for a protective order, he attempted to get the Cabinet involved by complaining to them about the condition of the marital home. The Cabinet told him they could not open a case, gave him an 800 number to call, and told him they would call him back if they deemed it necessary. That was the last he heard from them. He felt the children could not wait that long, so he visited the county attorney who advised him to file a petition for a protective order. Mykal was adamant that he only wanted custody of the children until Julina established a stable and suitable home for her children.

Next, Investigator Key testified that during his interviews with the children they expressed fear of Kevin's anger issues and that he carried a firearm. They told him that they were living in the conditions depicted in the

13

photographs of the marital home, that it was "nasty," and that it had trash and dog feces and urine throughout it. In addition to the marital home, the children had also lived in vehicles in various places such as local parks and a Walmart parking lot. When the children were on Kevin's property, they stayed in a tractor trailer container with an extension cord running to it. During cross-examination he conceded that the vaccinations the children were behind on were not required for homeschooled children, and that the children did not claim that Kevin had ever threatened them with his gun. Investigator Key told the court that the Cabinet was still not investigating and that it would be up to Mykal to formally request its involvement, again.

The court then allowed Alex to testify upon a *sua sponte* finding that he was capable of doing so based on its interview of him during Kevin's hearing. Alex testified that during Julina's visit with the children at Mykal's home she told them that "if and when" she got custody back, they would never see their family or Mykal again. Alex understood her statement to mean that the children would go back to living the way they were before Mykal got custody of them. This upset him because neither he nor his siblings want to live that way again. Alex and his siblings wanted to continue living with Mykal where they had a stable lifestyle and a regular schedule. He further said that he felt Julina would take them out of school again and that he and his siblings did not want that; they liked being in school and they were making friends. Alex was also very upset by the incident that occurred between Julina and Alan. Julina was trying to get a trailer hitch from Alex that she believed belonged to

14

Kevin. Alex refused to give it to her and instead put it in Alan's car. Alex said that Julina "dove headfirst" into Alan's car as he was leaving.

Alex again testified that the photographs of the marital home accurately depicted the way it looked when they lived there, and that after they stopped staying in the marital home full-time, they stayed in a car or in the basement of Mykal's church. Alex considered them to be homeless because they did not have a proper place to live. He was unsure of whether Mykal knew they were homeless; Julina was "very discreet" and had a key to the church. Julina homeschooled the children, though "not very well," through a company called Christian Light Publications. Julina would sometimes help them, but they were usually "on their own." Alex said he had not had a proper checkup in four or five years and that Julina is very against immunization and prefers herbal healing.

Alex further testified that he is afraid of Kevin and that Kevin carries a gun and has anger management issues. Kevin once told Alex that he has a "short fuse" and that when he loses his temper he can "commit atrocities." Kevin's home had dog feces all over it and smelled like must and mold. Whenever the children were there, they would either sleep in the house, the car, or in the tractor trailer container.

After the hearing, the circuit court found on an AOC-275.3 Form that Mykal had established "by a preponderance of the evidence, that an act(s) of domestic violence and abuse . . . has occurred and may again occur[.]" Under the terms of the order Mykal was granted temporary custody of the children,

15

but Julina was given "supervised visitation by Petitioner, Mykal Ringstaff, in Mr. Ringstaff's home, at his discretion, and as he permits." The terms of the order were to remain in effect for one year.[5]

Kevin and Julina both appealed, and the the Court of Appeals addressed their appeals in a consolidated opinion.[6] Relying primarily on *Collett v. Dailey*,[7] which we will discuss in more detail below, the Court of Appeals affirmed.[8] The court reasoned that substantial evidence supported the circuit court's finding that the children were at a risk of imminent danger from Kevin and Julina based on "the specific circumstances of this case."[9] In particular, the court took note of: the filthy and unsafe state of the marital home, the nomadic existence the children were forced to live before they began staying at Kevin's home, the unsafe conditions they were forced to live in at Kevin's home, the children's consistent statements that they were afraid of Kevin and were afraid of living in that environment, Kevin's anger management issues, and Julina's choice to continue seeing Kevin after a DVO was entered against him.[10]

---

[5] Julina's appeal is not moot even though her DVO is no longer in effect. *See Caudill v. Caudill*, 318 S.W.3d 112, 114 (Ky.App.2010) (holding that the expiration of a DVO did not moot the appeal due to the continuing consequences from having a DVO on the respondent's criminal record).

[6] *Winland v. Ringstaff*, 2021-CA-1153-ME, 2022 WL 2182918 (Ky. App. June 17, 2022).

[7] 371 S.W.3d 777 (Ky. App. 2011).

[8] *Ringstaff*, 2022 WL 2182918, at *9.

[9] *Id.*

[10] *Id.*

16

The court held the foregoing evidence established that Kevin and Julina had inflicted fear of imminent physical injury upon the children, and that the risk of harm escalated when it was time for them to leave Mykal's residence and return to Kevin's residence.[11] The court accordingly held that, although this case would have been better addressed as a dependency, neglect, and abuse (DNA) action, the circuit court did not abuse its discretion by issuing the DVOs in order to protect the children from being further subjected to the risk of harm posed to them by being in Julina's and Kevin's care.[12] Kevin and Julina now appeal the Court of Appeals' ruling to this Court.

Additional facts are discussed below as necessary.

## II.  ANALYSIS

Preliminarily, this Court is compelled to note its agreement with statements made by both the circuit court and the Court of Appeals that this situation could have been better addressed under a DNA petition.[13] However, the particular circumstances of this case made that option an impossibility: Mykal sought the Cabinet's intervention on behalf of these children, and it declined.[14] If the Cabinet is unable or unwilling to intervene on behalf of these

---

[11] *Id.*

[12] *Id.*

[13] *See* KRS Chapter 620.

[14] We acknowledge that KRS 620.070(1) states that "[a] dependency, neglect, or abuse action may be commenced by the filing of a petition by any interested person in the juvenile session of the District Court." Thus, Mykal could have chosen to file a dependency, neglect, and abuse action in this matter instead of, or in addition to, the domestic violence petition.

17

children, that does not mean that they should be left to suffer under the horrific conditions they have been subjected to with no legal remedy to escape it. The General Assembly has provided by statute that the domestic violence and abuse statutes "shall be interpreted to [a]llow victims to obtain effective, short-term protection against further wrongful conduct in order that their lives may be as secure and as uninterrupted as possible[.]"[15] Additionally, this Court has held that, although the construction of the domestic violence and abuse statutes should not be unreasonable, the statutes "should be construed liberally in favor of protecting victims from domestic violence and preventing future acts of domestic violence[.]"[16]

Accordingly, the issue now before us is straightforward: whether there was sufficient evidence against Kevin and Julina, respectively, for the circuit court to issue domestic violence orders against them. For the reasons that follow, we hold that there was.

**A. Standard of Review**

A trial court may issue a domestic violence order if it "finds by a preponderance of the evidence that domestic violence and abuse has occurred and may again occur[.]"[17] The preponderance of the evidence standard is met when the evidence establishes that the alleged victim was more likely than not

---

[15] KRS 403.715(1).

[16] *Caudill*, 318 S.W.3d at 115.

[17] KRS 403.740(1).

a victim of domestic violence.[18]  A trial court's finding of fact cannot be set aside unless it is clearly erroneous,[19] i.e., unsupported by substantial evidence,[20] and "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses."[21]  An appellate court reviews a trial court's entry of a DVO by determining whether the court's finding of domestic violence was an abuse of discretion.[22]  "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[23]

## B. The circuit court did not abuse its discretion by entering domestic violence orders against Kevin and Julina.

"Domestic violence and abuse" is defined by statute as "[p]hysical injury, serious physical injury, stalking, sexual abuse, strangulation, assault, or the infliction of fear of imminent physical injury, serious physical injury, sexual abuse, strangulation, or assault between family members[24] or members of an unmarried couple[.]"[25]  Under the facts of this case, the definition of domestic violence and abuse that is at issue is whether Kevin and Julina inflicted "fear of imminent physical injury."

---

[18] *See, e.g., Caudill*, 318 S.W.3d at 114.

[19] Kentucky Rule of Civil Procedure (CR) 50.01.

[20] *Caudill*, 318 S.W.3d at 114-15.

[21] CR 50.01.

[22] *Johnston v. Johnston*, 639 S.W.3d 428, 431 (Ky. App. 2021).

[23] *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky.1999).

[24] "Family member" is defined broadly to encompass "any other person living in the same household as a child if the child is the alleged victim[.]"  KRS 403.720(3).

[25] KRS 403.720(2)(a).

19

Kevin and Julina argue before this Court that there was no evidence that either of them inflicted fear of imminent physical injury, and that the trial court's finding that environmental neglect can constitute domestic violence was an abuse of discretion. As part and parcel to their latter argument, they assert that this Court should overrule *Collett v. Dailey*, the case primarily relied upon by the Court of Appeals in its decision to affirm.

The petitioner in *Collett*, Oneeta Dailey, was the legal guardian of her elderly mother, Hazel Collett.[26] Oneeta filed a petition for a domestic violence order against her brother, James Collett, on Hazel's behalf.[27] Oneeta's petition alleged that James "committed numerous acts of verbal abuse, harassment, and interference with caregivers who were providing nutritional, medical, and physical care to Hazel."[28] During the hearing that followed, the evidence was that Hazel was eighty-three years old, had recently broken her hip, used a walker, was at a high risk of falling, and needed assisted care.[29] James "prevented caregivers from attending to his mother; from giving Hazel her medications and food; and, from providing physical support and assistance to her."[30] He would also remove night lights and place throw rugs in areas where Hazel needed to walk, which impeded her ability to safely walk in her home.[31]

---

[26] *Collett*, 371 S.W.3d at 778.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

20

The Court of Appeals upheld the trial court's finding of domestic violence, holding that "because of Hazel's fragile condition, these actions by James met the statutory definition of domestic violence."[32] The court reasoned that, "James put [Hazel] (or, in this case, her guardian) in fear of imminent physical injury and serious physical injury as contained in the definition of domestic violence found in KRS 403.720[(2)(a)]," and that

> [t]he trial court could certainly find that James's actions were not mere interference or harassment but were actions that could have left his mother without medically required care *and that created dangerous conditions within the home.* Oneeta and the representative of Adult Protective Services testified that they were afraid that James's actions would result in physical injury to Hazel since *James engaged in a pattern of conduct that continuously placed his mother at risk.*[33]

The evidence therefore supported the issuance of a protective order.[34]

Judge Taylor dissented, arguing that that James' actions did not meet the statutory definition of domestic violence and abuse.[35] He further noted that Oneeta could have instead sought a temporary or permanent injunction against James under CR 65.01 for interference in the performance of her statutory duties.[36]

To begin, this Court does not believe there is any reason to overrule *Collett.* Even in the face of Judge Taylor's dissent, this Court denied

---

[32] *Id.*

[33] *Id.* at 779 (emphasis added).

[34] *Id.* (emphasis added).

[35] *Id.* at 779-80.

[36] *Id.* at 780.

21

discretionary review in that case, and although *Collett* was rendered over a decade ago, the General Assembly has not altered the definition of domestic violence in response to it.[37]  However we do acknowledge that *Collett* is clearly a very different factual scenario from the case now before us, and the case itself provides that it is based on its own particular facts and circumstances.[38]  But, for the purposes of this case, we believe *Collett* stands for the proposition that under the appropriate circumstances a respondent that intentionally subjects a vulnerable individual—for example, someone who is elderly and infirm, a child, or a dependent adult with intellectual disabilities—to dangerous environmental conditions within the home can be found to have committed domestic violence. With this in mind, we will now address the appellants' argument that the trial court erred by entering DVOs against them.

First, regarding Kevin, Mykal testified that he was greatly concerned for the children's safety around Kevin because he has severe anger management issues, behaves erratically, and carries a firearm.  Investigator Key testified that the children appeared to be apprehensive to talk to him about Kevin, and that the children told him they were afraid of Kevin because he loses his temper and carries a gun.  The children also told him that Kevin and Alex had

---

[37] *See, e.g.*, *Toyota Motor Mfg., Kentucky, Inc. v. Prichard*, 532 S.W.3d 633, 636 (Ky. 2017) ("[T]he failure of the legislature to change a known judicial interpretation of a statute [is] extremely persuasive evidence of the true legislative intent. There is a strong implication that the legislature agrees with a prior court interpretation of its statute when it does not amend the statute interpreted." (quoting *Rye v. Weasel*, 934 S.W.2d 257, 262 (Ky. 1996))).

[38] *Collett*, 371 S.W.3d at 779 ("Based upon the particular facts and circumstances of this case, the trial court's findings were not erroneous[.]").

gotten into verbal altercations three separate times. Additionally, Investigator Key stated that the children expressed environmental fear, and Alex told the court that while staying on Kevin's property, the children were required to sleep in either a home that was "trashed" and covered in dog feces, or outside in a car or tractor trailer container. Based on this evidence, we hold that the trial court could have reasonably inferred that both Kevin's conduct and the environment they were forced to live in placed the children in fear imminent physical injury.[39] We therefore cannot hold that the trial court's entry of a DVO against Kevin was arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

Next, concerning Julina, we first highlight that as the children's parent she had an affirmative legal duty to protect and prevent harm to her children. "At common law. . . parents, concomitant with their fundamental right to raise their children and to have the benefit of the children's services, had a duty to protect, maintain, and educate them."[40] These common law duties have been codified in this Commonwealth in a number of civil and criminal statutes. For example, in the criminal context, this Court has previously stated that under our "Penal Code and other statutory provisions enacted for the protection of

---

[39] *See Hohman v. Dery*, 371 S.W.3d 780, 783 (Ky. App. 2012) (holding that trial court did not err by entering DVO based on petitioner's testimony that respondent was aggressive, behaved erratically, was unable to control his emotions, and that she feared his conduct would escalate).

[40] *Bartley v. Commonwealth*, 400 S.W.3d 714, 728 (Ky. 2013). *See also Cashen v. Riney*, 40 S.W.2d 339, 341 (Ky. 1931) ("It is the legal, as well as the natural, duty of parents not only to educate, maintain, and support their infant children, but also to shield and protect them from evil and injury.").

23

children, particularly the criminal abuse statutes, a parent's duty to protect his or her child from harm . . . includes the duty to protect the child from abuse by the parent's spouse or domestic companion."[41] Parents can accordingly be subject to criminal penalties for failing to protect their children from harm inflicted by a non-parent.[42] In addition, KRS 620.010 from our dependency, neglect, and abuse statutes "creates an affirmative duty for the parent of a child to prevent such physical injury which would result in an assault on that child."[43]

Relevant to this case, the natural and legal parental duty to protect has also been extended into the realm of DVO cases. In *Dunn v. Thacker,* a father filed a petition for a DVO against his child's mother on the child's behalf.[44] The father alleged that the mother's live-in boyfriend had exhibited abusive behavior towards the child of which the mother had knowledge.[45] The father presented text messages from the mother discussing the boyfriend's abusive behavior as evidence of her knowledge that the abuse was occurring.[46] The trial court issued a DVO against the mother, finding that "[mother] knew or

---

[41] *Staples v. Commonwealth*, 454 S.W.3d 803, 813 (Ky. 2014).

[42] *Tharp v. Commonwealth*, 40 S.W.3d 356 (Ky. 2000) (upholding mother's conviction for complicity to wanton murder based on the violation of her legal duty to protect her child from physical assaults by the child's stepfather); *Lane v. Commonwealth*, 956 S.W.2d 874 (Ky. 1997) (upholding mother's conviction for complicity to first-degree assault based on her failure to protect her child from physical injuries inflicted by her domestic companion).

[43] *Lane*, 956 S.W.2d at 875.

[44] 546 S.W.3d 576, 577 (Ky. App. 2018).

[45] *Id.*

[46] *Id.*

should have known or allowed or permitted [boyfriend] to be a threat of physical injury to [child] as evidenced by the texts she sent to [father]."[47]

On appeal, the mother argued that the DVO could not stand because it improperly named her as the respondent instead of her boyfriend and that there was a lack of substantial evidence against her.[48] The Court of Appeals disagreed and upheld the DVO.[49] The court reasoned that "[mother's] very inaction in the face of harm inflicted on her child—or upon any child under her care—is tantamount to abuse."[50] In reaching its holding, the court discussed both *Lane, supra,* which established that a parent may be held criminally liable for failing to protect a child against the criminal acts of another, as well as the statutory duties imposed under KRS Chapter 620.[51] On those bases, the court held:

> In the case before us, we are persuaded that the DVO was properly entered as to [mother]—even though she may not have been the individual directly responsible for the abuse. She was aware of the abuse, and under the statutory law and case law that we have reviewed, we believe that this is a wholly appropriate case in which to expand the scope of the protection of our domestic violence statutes. The trial court exercised sound discretion in its entry of a DVO against [mother].[52]

---

[47] *Id.*

[48] *Id.* at 578.

[49] *Id.*

[50] *Id.*

[51] *Id.* at 578-80.

[52] *Id.* at 580.

In the case now before us, despite Kevin's verbal abuse of Alex and his anger issues that clearly made her children fearful of him, Julina continued to allow Kevin to be around her children, and even sanctioned Kevin's behavior by telling Alex that he "must obey" Kevin. In addition, she continued to see Kevin after the circuit court entered a DVO against him.

Furthermore, over a period of several years she intentionally engaged in a pattern of conduct that continually placed her children at risk. Beginning with the marital home, she allowed her children to live in an environment that had piles of trash and debris in every room, was infested with roaches and fleas, had several piles of dog feces in at least one of the children's bedrooms, and had at least two large holes in the ceiling. There is no doubt that the marital home was unsanitary enough to cause Mykal to fear that the children were in danger of imminent physical harm.

Then, when Mykal's ex-wife threatened to report Julina to the Cabinet, she began constantly moving the children and forcing them to live homeless presumably to prevent anyone from intervening to help the children. Alex testified this was because Julina knew she was neglecting them and feared they would be taken away from her. In addition, she was not ensuring that their medical needs were met. Regardless of Julina's stance on vaccinations, children need regular medical and dental checkups to ensure they are healthy and developing normally. Yet according to Alex, she allowed the children to go

26

five to six years without proper medical care. This too subjected them to a risk of physical harm.

Finally, in addition to subjecting the children to Kevin's angry outbursts and erratic behavior, she allowed them to stay on his property. The testimony was consistent that Kevin's home was just as deplorable as the martial home: trash and dog feces in every room and smelled so horrible that it was difficult to breathe in. And if the children understandably did not want to sleep in Kevin's home, they were forced to either sleep in a car or in a tractor trailer container with an extension cord running to it for electricity.

Therefore, this Court identifies at least two bases upon which the circuit court could have properly based its entry of a DVO against Julina. The first is her failure to protect her children against Kevin's mistreatment despite her knowledge that it was occurring. The second is her own actions in intentionally subjecting her children to dangerous and unacceptable living conditions. We accordingly hold that the trial court's entry of a DVO against her was not arbitrary, unreasonable, unfair, or unsupported by sound legal principles.

## C. The Appellants' arguments that Mykal lacked standing to seek custody of the children and that the visitation ordered by the circuit court was unreasonable are not properly before this Court.

Julina's and Kevin's final arguments are that the circuit court erred by awarding Mykal custody of the children because Mykal failed to prove he had standing to pursue custody, and that Julina's supervised visitation ordered by the court was not reasonable. However, neither of these arguments were

27

asserted before the trial court or the Court of Appeals, and they were not argued in the parties' joint motion for discretionary review submitted to this Court. Unlike a trial court's subject matter jurisdiction, "[t]he issue of standing is a defense that may be waived" if it is not timely pled.[53] Here, because neither Julina nor Kevin asserted before the trial court that Mykal did not have standing to pursue custody, the issue is waived and we will not address it. Moreover, "a party may not raise an issue for the first time on appeal"[54] and "issues not raised in the Motion for Discretionary Review will not be addressed by this Court despite being briefed before us and addressed at oral argument."[55] We consequently also decline to address the reasonableness of the supervised visitation ordered by the court under Julina's DVO.

### III. CONCLUSION

Based on the foregoing, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANTS:

Danny Lee Lunsford, Jr.
Howard Law Firm

COUNSEL FOR APPELLEE:

Otis Doan, Jr.
Doan Law Office

---

[53] *Harrison v. Leach*, 323 S.W.3d 702, 705 (Ky. 2010).

[54] *See, e.g.*, *Taylor v. Kentucky Unemployment Ins. Com'n*, 382 S.W.3d 826, 835 (Ky. 2012)

[55] *Wells v. Commonwealth*, 206 S.W.3d 332, 335 (Ky. 2006).